## BOSLEY ET UX. *v.* THE GRAND LODGE OF ANCIENT FREE AND ACCEPTED MASONS OF MARYLAND

[No. 13, September Term, 1971.]

*Decided November 10, 1971.*

*Motion for rehearing filed December 10, 1971; denied December 13, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY and DIGGES, JJ.

Kenneth T. Bosley, in proper person, with whom was *Lewis C. Merryman* on the brief, for appellants.

*Charles C. W. Atwater,* with whom were *Mylander & Atwater* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

This appeal involves an action in ejectment filed in the Circuit Court for Baltimore County by the appellee, The Grand Lodge of Ancient Free and Accepted Masons of Maryland, a Maryland Corporation (Grand Lodge), against the appellants, Kenneth T. Bosley and Phyllis B. Bosley, his wife. The land involved is a 3.4 acre tract in the Eighth Election District of Baltimore County to which the Grand Lodge claims good record title and title by adverse possession. The two principal questions before us are whether the trial court erred (1) in its instructions to the jury in regard to the elements of adverse possession and (2) in declining to grant the motion of the Defendants-Appellants for a directed verdict or their motion for a judgment n.o.v. because of insufficient evidence in the case for the jury to find for the plaintiff, Grand Lodge, on the basis of either adverse possession or legal record title. The appellants raise additional questions to which reference will later be made.

Grand Lodge has owned and used the property in Baltimore County known as "Bonnie Blink" for many years as a lodge home for elderly members and as a farm. It acquired Bonnie Blink by a deed from John B. Wailes and wife, dated June 30, 1927, and duly recorded among the Land Records of Baltimore County in Liber W.P.C. No.

645, folio 333, etc., for 266.1 acres of land. The description in this deed is divided into two parts—one for 262.7 acres, the other for 3.4 acres, the latter being the parcel involved in this case. The description was prepared in June 1927 by the late J. Spence Howard, a surveyor, and is based on a survey made by him. This plat was introduced into evidence as "Court's Exhibit No. 2." A title map of Bonnie Blink was prepared by Dollenberg Brothers, surveyors and civil engineers, dated March 9, 1960, with a scale of one inch equals 200 feet. It bears the notation, "Note: This plat is traced from a plat prepared by J. Spence Howard, Civil & Consulting Engineer." It was introduced into evidence as "Plaintiff's Exhibit No. 5." For convenience in showing the courses and distances as well as monuments used to indicate the boundaries of the 3.4 acre tract, a portion of the Dollenberg map has been reproduced and contains certain notations added by this Court. The reporter is directed to include this portion of the Dollenberg map as part of this opinion.[1] On the Dollenberg map the 20 foot right of way of the Maryland Gas Transmission Corporation over the 3.4 acre tract is indicated. This did not appear on the Howard plat inasmuch as it was granted *after the Howard plat was prepared* in June 1927. The 3.4 acre parcel is also shown on the Warrant of Resurvey plat prepared by William G. Ulrich, Jr., the Baltimore County surveyor. This plat was introduced into evidence as "Court's Exhibit No. 3."

The deed of June 30, 1927, was apparently prepared by Walter C. Mylander, Sr., a member of the Maryland Bar. After an elaborate metes and bounds description of parcel 1 containing 262.7 acres of land, more or less, the deed then describes parcel 2 as follows:

> "Beginning for the second thereof at a point
> on the south side of Western Run, said point
> being at the end of the north nine degrees thirty

---

1. The Dollenberg map, rather than the Howard plat, is used because it is more easily and clearly reproduced.

three minutes west two hundred and five and 3/10 (205.3) foot line of the tract containing two hundred and sixty two and 7/10 (262.7) acres, more or less, hereinabove first described, said point of beginning being also at the Junction of the south side of the present location of Western Run and the west side of the Old location of Western Run and running thence by a line across the present location of Western Run north twenty eight degrees forty seven minutes west one hundred and ninety eight and 4/10 (198.4) feet to stone marked No. 9, G.L.M. set on the west bank of the Old location of Western Run and running thence and binding on the southernmost side of the old stream bed of Western Run the seven following courses and distances, north four degrees thirty seven minutes west one hundred and eighteen and 8/10 (118.8) feet to stone marked No. 8, G.L.M. north fifty one degrees twenty five minutes west ninety six and 65/100 (96.65) feet to stone marked No. 7, G.L.M. south seventy nine degrees thirty nine minutes west one hundred and thirteen and 25/100 (113.25) feet to stone marked No. 6, G.L.M. south fifty four degrees twenty seven minutes west one hundred and thirteen and 3/10 (113.3) feet to stone marked No. 5, G.L.M. south sixteen degrees twenty two minutes west two hundred feet to stone marked No. 4, G.L.M. south eight degrees twenty minutes east two hundred and thirty feet to stone marked No. 3, G.L.M. and south twenty three degrees twenty minutes east one hundred and thirty nine and 18/100 (139.18) feet to stone marked No. 2, G.L.M. planted at the junction of the northwest side of the present location of Western Run and the east side of the old location of Western Run and running thence by a line across the present location of Western Run,

south thirty eight degrees twenty minutes east eighty three and 4/10 (83.4) feet to the end of the south seventeen degrees thirty nine minutes west one hundred and eighty seven and 3/10 (187.3) foot line of the tract containing two hundred and sixty two and 7/10 (262.7) acres hereinabove first described, thence along the southeast side of Western Run and binding reversely on the lines of the said whole tract containing two hundred and sixty two and 7/10 (262.7) acres hereinabove first described the three following courses and distances, north seventeen degrees thirty nine minutes east one hundred and eighty seven and 3/10 (187.3) feet north thirty two degrees thirty six minutes east two hundred and sixty and 2/10 (260.2) feet and south sixty four degrees thirty minutes east one hundred and fifteen feet to the place of beginning.

"Containing three and 4/10 (3.4) acres of land, more or less."

The plaintiff, Grand Lodge, offered in evidence the testimony of George Walter Tyrie, an "old-time" stone cutter since 1904, who produced his original ledgers from 1927. These included his bill addressed to the Grand Lodge in care of Walter C. Mylander, entered on June 25, 1927, for 18 granite land markers, eight inches by eight inches by two feet, marked "G.L.M. 1" to and including "G.L.M. 18." His original diagram for these markers was produced and introduced into evidence. Mr. Tyrie testified that his brother delivered these markers, moved them from place to place at the site but the surveyors set the markers. Markers G.L.M. 2 through G.L.M. 8 were placed at the end of each call on parcel 2. These locations were established by the Ulrich survey and were shown to the jury at the time the jury inspected the property.

The Maryland Surveying and Engineering Company

had purchased the records of J. Spence Howard from his estate. They were produced at the trial by James R. Cassell of that company. At the request of the Grand Lodge, Mr. Cassell inspected the property in question after the appellants had asserted their claim to it and located stones numbers G.L.M. 3, 4, 5, 6 and 9 in place in the ground. He saw what appeared to be stone number 8 lying on top of the ground. He could not locate stones numbers 2 and 7. When he revisited the property in 1969, the monuments were gone. When asked if there was any evidence on the ground to indicate whether there had been an old stream bed as indicated by the Howard plat, Mr. Cassell testified that there was a depressed area that "could have been a stream bed that had been eroded and filled in." When asked his opinion in regard to how the change could have taken place between the "old stream bed" and the present location of the bed of Western Run, he stated that he was of the opinion that instead of a gradual erosion of the bank, Western Run "had cut right on through there rather than going around the long way, just flowed and made its own river beds stream, just cut off part of the loop going around it."

Mr. Ulrich located the conflicting claims of the parties on the land and indicated these conflicting claims on his Warrant of Resurvey plat. He used the metes and bounds description of the Grand Lodge deed and plat to fix the locations of stones 2 through 8. There was no metes and bounds description of the division line in the Bosley title, the call being to bind on the southerly side of Western Run. In order to locate the lines as claimed by the Bosleys, Mr. Ulrich used adjacent titles to locate these lines. Generally speaking, the Bosley lines on the west, north and east of parcel 2, the 3.4 acre tract, follow the outer perimeter of the "old stream bed" appearing on the plat included in this opinion, with depths varying from 400 feet to 75 feet. To the west, north and east of the Bosley lines is the land of Charles V. Roller. Mr. Ulrich stated that there were indications in the other descriptions that there had been a stream at one time in the

location of the "old stream bed" delineated on the Howard plat. He located a beginning stone of the Roller land adjacent to the Bosley land and marked the stone on the Warrant of Resurvey plat "stone found Bosley and Roller." The calls in the Roller deed indicated to him that the Roller land bounded on a "body of water." It was indicated that the Roller beginning stone was on the north side of Western Run. Mr. Ulrich concluded that he could not "decide title lines" and would not say what was the old line of Western Run, but he had evidence from the Howard plat that "Western Run went in this area at one time." He stated that Mr. Howard was as "competent as any other man in the business at the time."

John H. Hessey, Sr., a member of the Maryland Bar for 57 years, had been associated with the Grand Lodge for more than 50 years. He was Master of his Lodge in 1927. He had been counsel for the Board of Bonnie Blink and for the Grand Lodge since 1935 and still is. He had custody of the Grand Lodge minute books and records. He was familiar with the circumstances surrounding the purchase of the property by the Grand Lodge in 1927. The Grand Lodge employed Spence Howard to prepare the Howard plat in evidence in the case. Mr. Hessey produced the real estate tax receipts of the Grand Lodge from 1928 to date. These receipts showed that the Grand Lodge paid real estate taxes on 266.1 acres of land. The Grand Lodge records showed that in 1938 it had given permission to members of the Green Spring Valley Hunt Club to hunt across the property. An agreement concerning conservation of the soil of the property in 1942 was produced. Also produced from the Grand Lodge records was a 1944 contract for cutting timber. All of the agreements included the 3.4 acre tract. Timber was again cut in 1959.

The Grand Lodge minutes of September 16, 1959, reported that Bosley claimed title to three acres, more or less, on which timber was being cut. It was noted that the matter had been reviewed by Bosley with counsel for the Grand Lodge, plats were exhibited and Bosley was

informed that he had no title to the acreage he was apparently claiming.

From his own records, Mr. Hessey testified that shortly prior to March 12, 1965, he received a report from Frank L. Smith, Jr., Executive Director of the home, that bulldozers were bulldozing part of the property. Mr. Hessey went out to the property with Mr. Smith and saw two men bulldozing on the 3.4 acre parcel. These two men disregarded anything he had to say. He had a conversation with Mr. Bosley who came to Mr. Hessey's office on March 12, 1965. Mr. Bosley stated that he had not done the bulldozing.

Mr. Hessey identified the granite marker which had been brought to the courtroom. The marker was eight inches by eight inches by two feet in size. He stated that it was the marker found by him when he visited the property in March 1965. He had kept two or three small pieces of granite which had been chipped off the top of the marker but these pieces did not include the "G.L.M." letters.

Mr. Hessey identified a certified copy of a deed, dated November 11, 1850, from Elizabeth Webster, et al. to Thomas Matthews, recorded among the Land Records of Baltimore County in Liber G.H.C. No. 17, folio 35, *et seq.*, and previously introduced into evidence as "Court Exhibit No. 5," and admitted that this was the background deed in the titles of both the Grand Lodge and the Bosleys.

On cross-examination by Mr. Bosley, Mr. Hessey was asked whether he had called the police or made any official complaint in regard to the trespass of the bulldozer operators on Bonnie Blink land. Mr. Hessey replied: "No, I * * * interrogated you and tried to find out from you who was responsible for the men on there, and you denied to me at that time that you were responsible for it, and then I heard you say here the other day, that you * * * had employed them * * *."

The testimony of Frank L. Smith, Jr., Executive Director of the home, indicated that he had first been em-

ployed in 1955 by the Grand Lodge to operate the home. He had been shown around the Bonnie Blink property and had located the stone markers on parcel No. 2, the 3.4 acre tract. He generally confirmed the testimony of Mr. Hessey in regard to the bulldozer operators and the location of the stone markers in March 1965.

The Tax Assessment Records of Baltimore County since 1928 were introduced into evidence and showed that the Grand Lodge had been assessed for 266 acres for the Bonnie Blink property.

Mr. Bosley, on behalf of the defendants and appellants, called as his own witnesses former Grand Masters of the Grand Lodge, *i.e.,* William Norman Penn, Edward R. Saunders and William B. Stansbury, Jr. Mr. Stansbury, who is also a member of the Maryland Bar, testified that so far as he knew "from the period 1927 to 1965 there had been no question at all about the ownership of the property or any question of title or any dispute at all." He recalled that timber had been cut on parcel No. 2, the 3.4 acre tract, by the Grand Lodge.

The Bosleys produced the testimony of Miss Katherine A. McIntyre, a member of the Maryland Bar, who identified the Webster-Matthews deed of November 11, 1850, as the deed out of the common owner of the land of the Grand Lodge and the Bosleys to the Bosley's predecessors in title. The description in this deed begins in the center of the York Turnpike, proceeds in a northwesterly direction and then calls "to the southernmost bank of Western Run, thence running with and bounding on the meanders of the south and the southwest side of the said Run to the beginning. . . ." No survey was made of the location of Western Run at that time. This is the division line which is in dispute between the parties on the question of legal record title.

Russell M. Herbert, a registered land surveyor, was also called as a witness for the Bosleys. Mr. Herbert had made a survey for the Bosleys in 1966 and prepared a plat, the lines of which follow the present line of Western Run. These lines were transposed to the Warrant of

Resurvey plat prepared by Mr. Ulrich, to which reference has already been made. Mr. Herbert stated that he did not see any old stream bed. In his opinion a natural monument would take precedence over an artificial monument provided they call within reasonable calls. Reasonable calls of distance would only apply if there were a conflict between a call to a natural monument and a call to an artificial monument. He saw no evidence of a former stream bed in 1960 when he was on the property, and he thought it was impossible for Western Run to have changed "that much" in the period of 1850 to 1960.

The jury found a verdict for the plaintiff, Grand Lodge, but awarded no damages.

Additional facts will be given where thought necessary in the following discussion of the legal questions involved.

## (1)

We will first consider the questions raised by the Bosleys to the trial court's charge to the jury. The lower court prepared its proposed instructions in typewritten form and copies were given to counsel and Mr. Bosley before they were read to the jury. The instructions are full, complete and carefully considered. They comprise seven printed, single-spaced pages in the record extract. In the instructions the trial court, to a substantial extent, used our language in the case of *Blickenstaff v. Bromley*, 243 Md. 164, 220 A. 2d 558 (1966), in which Chief Judge Prescott, for the Court, reviewed the Maryland law in regard to the elements necessary to establish title to land by adverse possession.

The Bosleys objected to the lower court's charge to the jury on the ground that the factor of "visible" was missing from the charge. Judge Jenifer pointed out that the word "visible" was included in the charge and that, in any event, this Court in *Blickenstaff* "did not use the word 'visible' as one of the requirements of title by adverse possession." It was used later in the same context as the trial court had used it in connection with the word "notorious."

314

In the charge, the trial court instructed the jury, in part, as follows:

"The essential elements of adverse possession are that the possession must be actual, open, notorious, exclusive, hostile and continuous for the statutory period of twenty years under a claim of title or ownership. You will note from the deed to the Grand Lodge dated June 30, 1927, from John B. Wailes and wife, the parcel in dispute is described as the second parcel in said deed by specific metes and bounds and courses and distances, is recited to contain 3.4 acres of land, more or less, and consequently the Plaintiff has claim of title or ownership thereto. It is your function to decide whether or not the Plaintiff exercised the elements of possession that I have just outlined for a period of twenty years after receiving the deed referred to. If you are satisfied by a preponderance of the evidence that the Plaintiff did exercise these elements of possession during a twenty-year period after the deed of June 30, 1927, then the Plaintiff would have acquired title by adverse possession. If, on the other hand, you find that the Plaintiff did not exercise these elements of possession after June 30, 1927, for a period of twenty years, the Plaintiff would not have acquired title by adverse possession.

"In determining the issue of adverse possession and the acts of possession exercised by the Plaintiff, you should consider several factors. If you find from the evidence that after acquiring the conveyance of the parcel of land in question, the Plaintiff did in fact install granite monuments at the corners thereof, this would be evidence of actual, open and notorious possession and ownership on the part of the Plaintiff. It was not necessary for the Grand Lodge

to enclose the parcel by a fence to show its assertion of ownership.

"In determining whether there has been actual possession of property, there must be considered its character and locality, and the uses and purposes for which it is naturally adapted, since possessory acts of an outlying and uncultivated piece of land may be proved by acts of ownership somewhat different from those required with regard to land under enclosure and actual cultivation.

"It is sufficient if the acts of ownership are of such a character as to openly and publicly indicate an assumed control or use such as is consistent with the character of the premises in question. The standard to be applied to any particular tract of land is whether the possession comports with the ordinary management of similar lands by their owners, and if so, it furnishes satisfactory evidence of adverse possession. In general, it may be said that those acts which go to make possession actual, likewise suffice to make it visible and notorious.

"In order to ripen into title, adverse possession must be exclusive, that is the claimant must hold possession of the land for himself, as his own. * * *.

"The 'hostility' essential to acquisition of title by adverse possession does not necessarily import enmity or ill will, but rather that the claimant's possession be unaccompanied by any recognition, express or inferable from the circumstances, of the real owner's right to the land."

We stated in *Blickenstaff, supra*:

"Little need be added to show that the possession was 'open and notorious.' In *Bishop v. Stackus, supra,* this Court stated that, in gen-

eral, it may be said that those acts which go to make possession *actual*, likewise suffice to make it *visible* and *notorious*. In the instant case, the testimony is undisputed that the entire community, for a period far exceeding 20 years, considered the corner to be owned by the Blickenstaffs and their predecessors. Even Mr. Hoffman, whose family at one time owned the Bromley property, testified that he believed the Blickenstaffs' predecessor owned the parcel. We think and therefore hold that the possession was open, visible and notorious, and under claim of title."

(243 Md. at 172, 220 A.2d at 562; emphasis in the opinion in *Blickenstaff*.)

It is apparent that the charge on this point is entirely in accord with our holding in *Blickenstaff*, as indeed it was on all of the elements of adverse possession.

We see no error in the lower court's instructions to the jury.

(2)

The lower court properly denied the motions of the Bosleys for a directed verdict and, after the adverse verdict, for a judgment n.o.v., in that, in our opinion, there was sufficient evidence in the case for the jury to find for the plaintiff, Grand Lodge, on the basis that it had title either (a) by way of adverse possession or (b) by way of record legal title.

In considering a denial by the trial court of a motion for a directed verdict or for judgment n.o.v., we must accept as true the evidence of the adverse party and must draw such inferences of fact from such evidence as may be reasonably and fairly deducible therefrom. *Mondawmin v. Kres*, 258 Md. 307, 314-15, 266 A. 2d 8, 12 (1970) and cases therein cited.

(a)

In our opinion there was ample evidence of adverse possession by the Grand Lodge to submit to the jury.

The Grand Lodge entered into possession of the land in question under *claim of title* by virtue of the deed of June 30, 1927, apparently prepared by Walter C. Mylander, Sr., based upon the Howard plat and a description prepared by Mr. Howard. The tax bills and the Baltimore County Tax Assessment Records show the property subject to taxes in the name of the Grand Lodge since 1928. In 1930 the claim of title is further shown by the execution by the Grand Lodge to Maryland Gas Transmission Corporation of a deed dated December 22, 1930, duly recorded with a plat, granting a right of way across the 3.4 acre tract. The description in the 1930 deed begins at a stake being south 23 degrees 20 minutes east 32 feet from a certain stone marked G.L.M. 3, a corner in the lands of the grantor. The easterly end of the line calls to a stake being north 4 degrees 37 minutes west 21 feet from a set stone marked G.L.M. 9, a corner in the lands of the grantor. Mr. Ulrich considered this deed of December 22, 1930. Both the testimony of Mr. Hessey and of Mr. Stansbury was that the Grand Lodge had been in possession under claim of title under the deed of June 30, 1927.

There was also, in our opinion, sufficient evidence of an *actual, open, notorious and exclusive possession* by the Grand Lodge, bearing in mind the "character and locality" of the land and "the uses and purposes for which it is naturally adapted." See *Goen v. Sansbury,* 219 Md. 289, 296, 149 A. 2d 17, 21, 22 (1959) quoted with approval in *Blickenstaff, supra.* This evidence of acts which make the possession actual also make it visible. *Blickenstaff v. Bromley, supra.*

The evidence is as follows: the testimony of Mr. Tyrie of the making of the granite markers, their transportation to the subject property by his brother and their installation by the surveyor in eight locations as G.L.M. 2 through G.L.M. 9. These monuments were visible and were seen by Mr. Smith in 1955 when he became Executive Director of Bonnie Blink. They were seen by Mr. Hessey when he visited the property in 1965. They were

seen by Mr. Cassell when he visited the land in January, 1966 but he was not able to locate them upon his reinspection of the property in 1969. The Maryland Gas Transmission Corporation deed of December 22, 1930, describes the center line of its granted right of way with reference to the stones G.L.M. 3 and G.L.M. 9. The minute books of the Grand Lodge show permission given in 1938 to the Green Spring Valley Hunt Club to hunt across the property as well as contracts for the cutting of timber in 1949 and in 1959. Mr. Ulrich, although unable to locate stones G.L.M. 2 through G.L.M. 9, did locate stone G.L.M. 1, the top of which was approximately eight inches above the ground level.

### (b)

There was sufficient evidence, in our opinion, to submit to the jury on the question of Grand Lodge's record legal title, i.e., that the original title line in the 1850 deed was the line used by Mr. Howard when he made his 1927 survey. The Howard plat showed the location of Western Run in approximately its present position, but also showed an "old stream bed." Mr. Howard's survey plats and notes were properly introduced into evidence in view of our decision in *Klavens v. Siegel*, 256 Md. 476, 481-83, 260 A. 2d 637, 639, 640 (1970), and cases therein cited. Mr. Howard's notes were, however, confirmed in part by other testimony. Mr. Cassell testified that, when he visited the property the first time, there was a depression which could have been an old stream bed but which had eroded and filled in. The Dollenberg plat picked up Mr. Howard's notation in regard to the old stream bed, and this notation was again carried forward by Mr. Ulrich on his Warrant of Resurvey plat.

Mr. Cassell testified, in effect, that if the stream bed had changed from the location shown on the Howard plat, such a change would have been a violent cut which cut off part of the loop going around it. Mr. Ulrich also testified that the change in location of the stream bed may have been occasioned by a violent cut. This evidence, in

our opinion, was sufficient to justify the submission by the lower court to the jury of whether there had been an avulsion, rather than a gradual erosion.

The rule is stated by Mr. Justice Brewer, speaking for the Supreme Court of the United States, in *Nebraska v. Iowa*, 143 U. S. 359, 360-61, 12 S. Ct. 396, 397, 36 L. Ed. 186, 187-88 (1892), as follows:

> "It is settled law that when grants of land border on running water, and the banks are changed by that gradual process known as 'accretion,' the riparian owner's boundary line still remains the stream, although, during the years, by this accretion, the actual area of his possessions may vary * * *.
>
> "It is equally well settled that where a stream, which is a boundary, from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; and that the boundary remains as it was, in the center of the old channel, although no water may be flowing therein. This sudden and rapid change of channel is termed, in the law, 'avulsion.' "

See 2 W. Blackstone, *Commentaries* 262; *Gould on Waters* § 156 (2nd ed. 1891) ; 93 C.J.S. *Waters* §§ 76, 79. See also *Causey v. Gray*, 250 Md. 380, 387, 234 A. 2d 575, 581 (1968).

The lower court correctly instructed the jury:

> "The issue of fact [on the question of record title previously explained] for you to determine, therefore, is whether or not the stream known as Western Run between the year 1850 and the year 1927 changed its course. If you find that this stream did not change its course over these years, then the outlines of the property of the Defendants would include the parcel of land in dispute. If, however, you find that this stream

did change its course from a former location to its present location and did so in a gradual manner by the natural process of erosion, the land in question would have been added to the land of the Defendants and their predecessors in title by what is known in the law as accretion and the boundaries of the property of Mr. and Mrs. Bosley would thereby have been extended to include said land and the present boundaries of their property would be the southernmost side of Western Run as it now exists. If, on the other hand, you find that this stream did change its course from a former location to its present location and did so in a sudden manner as the result of a flood thereby cutting it off from a larger tract of which it was a part, then, in that event, the parcel in dispute would not have been added to the property of the Defendants and title thereto would remain in the Plaintiff, the Grand Lodge of Maryland."

As we have indicated, there was sufficient evidence to submit to the jury and to support its verdict on the issue of record legal title.

### (3)

The Bosleys raise several additional questions before us, all of which, in our opinion, are without merit and of which disposition can be quickly made.

### (a)

The Bosleys contend that the lower court should have sustained their demurrer to the declaration filed by the Grand Lodge in this case. Maryland Rule T40 states what a declaration shall contain, *i.e.*:

"(1) A statement that the plaintiff had been in possession of the land described,

(2) A description of the land sufficient to enable it to be located,

(3) A statement that the defendant ejected the plaintiff therefrom and retains possession thereof,

(4) The amount of damages claimed by the plaintiff."

The declaration avers that the Grand Lodge *was in possession* on March 8, 1965, of the 3.4 acre tract in the Eighth Election District of Baltimore County and then sets out its metes and bounds description from the deed of June 30, 1927, already quoted in full earlier in this opinion. It then averred that the Bosleys on March 8, 1965, wrongfully entered the land and ejected Grand Lodge from it and since that date have retained and still retain possession of the land. The Grand Lodge claims recovery of the land and damages of $10,000.00. The point of the Bosleys appears to be that the plaintiff, Grand Lodge, alleged that it *was in possession* of the land on March 8, 1965, and not that it *had been in possession* as stated in Rule T40 (1), stating that the plaintiff must establish adverse possession at the time the action is brought. This latter observation is accurate so far as proof is concerned; but the plaintiff need only aver that he was in possession of the land when ejected by the defendant which is what Rule T40 requires, viz., that he had been in possession when the defendant ejected him. There is no requirement that the plaintiff spell out in the declaration the nature of his title or possessory interest which gives him the right to possession.

It may be added that in the Bill of Particulars filed by the Grand Lodge, the time the plaintiff took possession under the deed of June 30, 1927, the making of a survey by Mr. Howard, the placing of the boundary stones and that the plaintiff had remained in continuous and exclusive possession of the subject property from June 30, 1927, until ejected by the defendants on March 8, 1965, are all set forth, as well as the items of damages claimed. We see no error in the overruling by the lower court of the demurrer to the declaration.

**(b)**

The Bosleys on October 14, 1966, filed a special plea of *res judicata* in which they alleged that in the case of *Atlantic Seaboard Pipeline Company v. Grand Lodge of Maryland and Kenneth T. Bosley and Phyllis Bosley (as Intervenors)*, the United States District Court for the District of Maryland during the Spring Term, 1966, ordered that the boundary line between the property of Grand Lodge and the property of the Bosleys be stipulated as "the southernmost bank, a water course, as the common boundary," which is *res judicata* of the boundary line in the instant case. It was moved that the instant case be dismissed with costs to be paid by Grand Lodge. To this special plea, Grand Lodge filed a memorandum to which was attached a copy of the stipulation and a copy of the plat prepared by The Atlantic Seaboard Corporation showing the center line of the easement for the proposed gas pipeline. This plat shows the exact location where the right of way to be acquired coincided with the common boundary line of Grand Lodge and the Bosleys which was approximately 1,600 feet from the 3.4 acre tract. Judge Jenifer, after a hearing, filed an order dated November 21, 1967, that the special plea of *res judicata* be denied.

It is clear from the Atlantic Seaboard plat that the federal case involved a right of way over parcel 1 and not parcel 2 of the Grand Lodge land, and the location of the right of way is a substantial distance from the 3.4 acre tract. Indeed, that plat shows the 3.4 acre tract to be within the title line of Grand Lodge.

There being no identify of issues in the two cases, the federal case is not *res judicata* of the issues in regard to the lines in parcel 2, the 3.4 acre tract, so that the lower court properly denied the special plea of *res judicata*. Generally, there must be both identity of the parties and of the subject matter in the prior case, as well as a final judgment rendered after the issue or question has been tried on the merits. *DeMaio v. Lumbermens Mutual Casualty Co.*, 247 Md. 30, 34, 230 A. 2d 279, 281

(1967), and cases therein cited. See also *Whitehurst v. Rogers*, 38 Md. 503, 514-15 (1873) and 1 Poe, *Pleading and Practice* § 655, page 681 (5th ed. 1925). Inasmuch as there was no identity of subject matter in the two cases, the doctrine of *res judicata* does not apply. Hence, it is unnecessary to decide whether the issues in the federal case were tried on their merits.

### (c)

The Bosleys contend that their plea of "not guilty" raises no question. Rule T42 b provides that the effect of a plea of not guilty in an ejectment action "shall be held a confession of the possession and ejectment, and shall put in issue as between the parties only:

(1) The title to the land,
(2) The right to possession of the land, and
(3) The amount of damages."

It is rather clear what questions are raised by the plea of not guilty, and it is not apparent what point the Bosleys seek to raise in this regard. Their brief seems to suggest that, inasmuch as the jury allowed *no damages* and there being no judgment for damages with no cross-appeal by the Grand Lodge, there is no issue in regard to damages before us. If this is their point, they are undoubtedly correct and, indeed, the Grand Lodge has not briefed or argued that it is entitled to any damages.

### (d)

The Bosleys appear to make the point that the deed of June 30, 1927, possibly indicated a "delivery" of the deed on February 7, 1931, which raises serious doubt in regard to the "verocity [sic] of the allegations" in the Bill of Particulars. The clerk's notation on the side of the recordation of the deed "(Del. per ticket Feb. 7, 1931)" obviously means that *the clerk* delivered the original deed to the person in possession of the deed ticket on February 7, 1931, not that the deed itself was delivered by the grantors to the grantee on that date. The certified copy of the deed of June 30, 1927, shows that

it was recorded among the Land Records of Baltimore County on "July 5, 1927 at 12 M & Exd." in Liber W.P.C. No. 645, folio 333, etc., and was obviously delivered as between the parties on or prior to that date.

### (e)

The Bosleys raise certain questions in regard to the pleadings and procedure in connection with the Warrant of Resurvey. It is not entirely clear what these questions are inasmuch as the lower court ruled in favor of the Bosleys in issuing the Warrant of Resurvey over the strenuous objection of the Grand Lodge that it was not necessary to do this in view of the Dollenberg plat and other plats.

Rule T44 provides for the issuance of the Warrant of Resurvey and states:

"a. *Written Application.*
An application for a warrant of resurvey shall be made in writing.

b. *Requirements.*
1. Before Issue.

A warrant of resurvey shall not issue unless it shall appear to the court that:

(a) The location of the land claimed is in dispute, or

(b) The location or extent of the land for the injury to which damages are claimed is in dispute, or

(c) The location of the dividing line is in dispute where the parties are claiming under the same title, or

(d) The plat is necessary for illustration.
2. Cost—Deposit.

The party seeking the warrant has deposited the estimated cost of executing the warrant with the clerk, if so directed by the court."

The Bosleys filed a petition for the issuance of the

Warrant of Resurvey on February 16, 1968, to which the Grand Lodge filed its answer objecting to its issuance on February 27. On March 1, the Bosleys filed a motion *ne recipiatur* to the answer and requested a hearing on the motion. Judge Jenifer denied the motion *ne recipiatur* on May 7, 1968. The lower court, however, by correspondence with Mr. Ulrich, Mr. Bosley and counsel for the Grand Lodge and after a hearing, directed Mr. Ulrich to proceed with the Warrant of Resurvey as requested by the Bosleys. The correspondence was duly filed in the case on August 8, 1969, as the docket entries indicate, but no *formal order* was entered for the issuance of the Warrant of Resurvey. This is possibly the ground of the present objection by the Bosleys; but this question cannot be raised for the first time on appeal, no such objection having been raised below. Rule 885. In any event, Mr. Ulrich proceeded to make the survey and prepared the Warrant of Resurvey plat, which was introduced into evidence as "Court Exhibit No. 3" without objection.

The Bosleys also now object to the procedure used in connection with the Warrant of Resurvey, although, here again, it is difficult to ascertain what the objection is. The Bosleys requested that the jury visit the site and the lower court properly designated Mr. Ulrich, the County Surveyor who made the Warrant of Resurvey plat, to accompany the jury and to answer any questions propounded to him by any member of the jury in regard to the location of the claims of the respective parties, the location of any of the physical monuments on the land and the pipes put in by him at the locations of stones G.L.M. 2 to 9 indicated on the Howard plat. The Bosleys did not object to this procedure in the lower court so that the question is not properly before us. Rule 885.

(f)

Finally, the Bosleys raise a question, also not raised below, in connection with the alleged "conflict of interest" of the court reporter and of Mr. Hessey because of

their membership in the Masonic order, in which order Mr. Bosley, himself, is a member. The point is also made that it is "fraud" for Mr. Hessey who has been counsel for the Grand Lodge to have testified in the case for the Grand Lodge.

There is no attempt by the Bosleys to show that the record in this case is not accurate in every detail so that the "charge" against the court reporter is without any foundation whatever.

The "charge" against Mr. Hessey is also without foundation. When Mr. Hessey—who had initially signed the pleadings in the case as co-counsel—realized that it would be necessary for him to testify, he withdrew his appearance as trial counsel, as the record indicates, and took no part in the trial of the case. His conduct was entirely proper.

As we have indicated, these questions were not raised by the Bosleys in the lower court and are not properly before us on appeal. Rule 885.

*Judgment affirmed, the appellants to pay the costs.*

PORTION of DeLLenberg MAP of 3-9-60. SHADED PART is PARCEL 2 on the HOWARD PLAT of JUNE 1927 AND is DESCRIBED IN The DEED of JUNE 30, 1927 To GRAND LODGE.

SCALE: 1" = 200'