KATZ ET AL. *v.* HOLSINGER, AN INFANT ETC. ET AL.

[No. 174, September Term, 1971.]

*Decided January 20, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SMITH and DIGGES, JJ.

*Thomas G. Andrew,* with whom were *Rollins, Smalkin, Weston & Andrew* on the brief, for appellants.

*Richard R. Beauchemin,* with whom were *Arnold, Beauchemin & Huber* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

The appellants, Francis Katz and Clara I. Griffin, the owners and landlords of a second floor apartment with a second story porch located at 1239 West Baltimore Street, Baltimore City (the subject property)—the de-

fendants below, appeal from a judgment obtained in the Baltimore City Court (Liss, J.) on May 18, 1971, by the appellees and plaintiffs below, Zella Mae Holsinger, an infant, by Nellie Esther Holsinger (tenant of the second floor apartment), her mother and next friend, and Mrs. Holsinger, for $64,000 and $7,500, respectively, with interest from February 10, 1971 (the date of the verdict), and costs. The verdict for Mrs. Holsinger under Count Two of the declaration for medical expenses and loss of services of her infant daughter was for $15,000, which, however, was reduced to $7,500 by a remittitur granted by the trial judge and accepted by Mrs. Holsinger. The principal questions presented to us are whether the lower court erred (1) in not directing a verdict for the defendants in that (a) there allegedly was no legally sufficient evidence that the defendant landlords had contracted, for a consideration, to repair the tenants' porch railing, (b) the failure of the landlords to repair the porch railing was not the proximate cause of the accident, and (c) the tenant had waived any contractual right to require the landlords to repair the porch railing and (2) in various instructions to the jury (a) in regard to permanent injury and (b) in regard to the landlords' duty to repair. In declining the motion of the landlords for a judgment n.o.v. or, in the alternative, for a new trial, Judge Liss filed a helpful written memorandum. Finding no error, we will affirm the judgments.

The jury could have found the following from the testimony. In 1960 Mrs. Holsinger and her husband became tenants of the subject property. There was no written lease. The rent was paid at first by the week. After the husband died on June 6, 1966, the rent was paid by the month. The only means of access to the subject property was by a wooden stairway in the rear of the premises leading to a porch on the second floor from which access was given to the second floor apartment itself. The porch was made of wood (as were the steps), with a wooden railing and a number of wooden balusters attached to the wooden railing and to the porch floor. The

landlords occupied the first floor as a men's store operated by Mr. Katz. The evidence offered on behalf of the plaintiffs indicated that at the time the subject property was rented in 1960, the landlords—through Mr. Katz—agreed to make the repairs to the subject property as a condition of the tenancy. During the time the husband was living, whenever he made repairs to the subject property, the landlords paid him for making those repairs. Indeed, Mr. Katz testified on cross-examination that the landlords "did all of the repairs to Mrs. Holsinger's apartment, inside and outside as part of her tenancy" and that "always throughout her tenancy anything to be done, we always did." He further stated that he did not expect Mrs. Holsinger to make any repairs to the porch.

Mrs. Holsinger testified that she noticed, approximately a week and one-half prior to July 21, 1967, the day of the accident, that two balusters were missing. She tried to put them back in place but was not able to do this because they were rotten. Mrs. Rebecca Nellie Evans, a neighboring tenant, noticed that the balusters were missing about three weeks before the day of the accident. About a week before the accident, she told Mr. Katz about the situation and told him that if he did not nail boards across the remaining balusters, "we are going to find little Zella Mae laying [sic] on the concrete down below." Mrs. Evans stated that Mr. Katz replied that he was "going to take care of it just as soon as he got time." The day before the accident, Mrs. Evans told Mrs. Griffin that she had some nails and a hammer and that she was going to "put a board across there to keep her (the baby Zella, then two years old) from falling out." According to Mrs. Evans, Mrs. Griffin said that she was not to do this "because Francis [Katz, the other landlord] is going to have it fixed."

On the morning of the accident, Mr. Katz, accompanied by a carpenter, Joseph Dotterweich, went to the porch to repair it. Because other workmen were on the roof

of the building making repairs to it, no repairs were then made, even though Mr. Katz admitted on cross-examination that "it was too serious a thing to put off."

Later on July 21, 1967, the infant plaintiff, Zella, after having been given a piece of pie by her mother, and while her mother was cutting a piece of pie for herself, suddenly went out of the door of the apartment and fell through the hole in the porch railing to the concrete pavement below. She suffered a fracture to her skull and to both wrists. Approximately six months after the accident, Zella suffered convulsions. She underwent electro-encephalogram tests at the University Hospital which revealed certain brain damage resulting in Zella's becoming an epileptic.

Additional facts will be given when the questions are later discussed. In considering the facts upon the motion of the defendants for a directed verdict or for a motion for judgment n.o.v., we resolve any conflicts of fact in favor of the plaintiffs and give them the benefit of any reasonable inferences deducible from the facts favorable to them. *Bosley v. Grand Lodge of Ancient Free & Accepted Masons of Md.*, 263 Md. 303, 316, 283 A. 2d 587, 596 (1971) and cases therein cited.

We will discuss the questions raised in the order already indicated.

### 1 (a)

The landlords correctly pointed out to us that at common law there was no implied covenant to repair and no warranty of the fitness of the leased premises for occupancy. As Judge (later Chief Judge) Hammond stated for the Court in *Farley v. Yerman,* 231 Md. 444, 448, 190 A. 2d 773, 775 (1963):

> "Although at common law there was no implied covenant to repair and no warranty of the fitness for occupancy of leased premises, a tenant now may maintain an action for injuries sustained as a result of an uncorrected defect in

> rented quarters if there was a contractual obligation to repair the particular defect and a reasonable opportunity to correct it. Under these circumstances the landlord has the obligation to use reasonable care to make the needed repairs with reasonable diligence; and if he does not, wilfully or negligently, and harm ensues as a result, there arises a tort liability, subject to the usual rules as to proof of causation and the absence of contributory negligence on the part of the tenant. *McKenzie v. Egge*, 207 Md. 1, 6-7."

We cited *Farley* with approval and followed it in *Sacks v. Pleasant*, 253 Md. 40, 251 A. 2d 858 (1969). We cited *Sacks* with approval in *Kleiman v. Mono of Maryland, Inc.*, 254 Md. 548, 255 A. 2d 393 (1969). See 1 Tiffany, *Landlord and Tenant* § 87, p. 134 (3rd ed. 1939); *Restatement (Second) of Torts* § 357, p. 241 (1965); 51C C.J.S. *Landlord & Tenant* § 366 (1), page 923.

The landlords contend that there was insufficient evidence that they had contracted, for a consideration, to make repairs to the subject property, including repairs to the porch. We do not agree with this contention. The testimony, not only of the tenant, but also by one of the landlords, was sufficient to present a jury issue in regard to the making of an agreement by the landlords with the tenants to repair the subject property as part of the original oral lease and supported by the consideration of that original leasing of the premises, as well as in regard to the landlord having sufficient notice of the particular defect and a reasonable opportunity to repair it.

## 1 (b)

The landlords next contend that, assuming for the argument that an enforceable contract to repair exists, nevertheless the failure of the landlords to repair the porch railing was not a proximate cause of the accident on the theory that the mother's allegedly negligent fail-

ure to prevent the infant Zella from going out on the porch—although not imputed to the infant from the fact of parenthood or custodianship by virtue of the provisions of Code (1969 Replacement Vol.) Art. 75, § 2 —was so extraordinary in the situation as to constitute a superseding cause of Zella's injuries, relying, in part, on the *Restatement (Second) of Torts, supra,* § 447, comment g at p. 480, as well as on *Farley v. Yerman, supra,* 231 Md. 444, 190 A. 2d 773 (1963) and *Barnes v. Housing Authority,* 231 Md. 147, 189 A. 2d 100 (1963).

In our opinion, *Farley v. Yerman* is dispositive of this issue contrary to the contention of the landlords.

As in the present case, *Farley* involved a young child (four years of age) of a tenant. The landlord urged that his negligence, if any, was merely passive and potential while the failure of the parents to make physical arrangements which would have prevented access to the flames of a gas log or to keep their children far enough away from them to prevent the accident was the moving and effective cause of the harm which made their negligence the only proximate cause of the injury. Judge (now Chief Judge) Hammond, stated for the Court:

> "We think the rule urged upon us is not applicable here. The landlord not only knew of the danger in the abstract but in the context of the almost continual presence of very young children in close proximity to the danger. He cannot disclaim realization that the parents might not be able to do more than they did, or that they would not do more, or that their acting as they did was not to be deemed so unusual or extraordinary as to be unreasonable or, finally, that the foreseeable acts or omissions of the parents would be but normal responses to a situation created by his own conduct.
>
> "All this being so, any negligence of the parents was not a superseding cause of the harm

which the landlord's negligent conduct was a substantial factor in bringing about. *Restatement, Torts,* Sec. 447. See also Sec. 452."

"In *McKenzie v. Egge, supra,* (at page 11 of 207 Md.) the Court, in rejecting the landlord's claim that the adult tenant was guilty of contributory negligence or assumption of risk, as a matter of law, in using the defective and dangerous porch of which she had complained and which collapsed and injured her, adopted Sec. 473 of *Restatement, Torts:* 'If the defendant's negligence has made the plaintiff's exercise of a right or privilege impossible unless he knowingly exposes himself to a risk of bodily harm, the plaintiff is not guilty of contributory negligence in so doing unless the risk is unreasonable.' *Miller v. Graff,* 196 Md. 609, held that a child of four cannot be guilty of contributory negligence. *Cf. State, use of Taylor v. Barlly,* 216 Md. 94, 101-102. Under Code (1957), Art. 75, Sec. 2, any negligence of her parents would not be imputable to the infant, Virginia Farley, from the fact of their parenthood." (231 Md. at 449-50, 190 A. 2d at 775-76.)

In the present case, the landlords not only knew that the balusters were missing and of the *theoretical danger* involved in this defective condition, but Mr. Katz—one of the landlords—was specifically warned of the *actual danger* to the two year old infant Zella prior to the accident. He must necessarily have realized that a parent cannot watch an active infant every moment and that in an instant she might leave her mother, go on the porch contrary to the mother's instructions and fall through the open hole in the porch railing. The acts or omissions of the mother in the instant case were not "so unusual or extraordinary as to be unreasonable" and the foreseeable acts or omissions by the mother "would be but the nor-

mal responses" to a situation created by the failure of the landlords to repair the porch railing.

### 1 (c)

Little need be said in regard to the contention of the landlords that, in any event, the tenant had waived any contractual right to have the landlords repair the porch railing because of the testimony of Mrs. Holsinger that sometimes Mr. Katz when asked to make repairs sometimes did them and sometimes he did not do them. This does not, of itself, indicate any waiver of the obligation, but rather a possible breach of the obligation by the landlords. There was evidence, as we have previously observed, that at times Mrs. Holsinger's husband would make the necessary repairs and the landlords would pay him later for doing this. It was at least a jury issue in regard to whether there had been any "waiver" of the obligation of the landlords to repair, and the jury verdict for the plaintiffs concludes this issue against the landlords.

### 2.

The landlords challenge the propriety of certain instructions of the lower court.

### (a)

Judge Liss in his charge to the jury stated in regard to damages:

> "In assessing damages you may consider these factors, the physical condition of the plaintiff before the accident as compared with her physical condition following the accident as a consequence of the injuries which you find she may have sustained, any mental and physical pain and suffering which the plaintiff has sustained as a result of the injuries, the extent, if any, to which the injuries are permanent in character, the medical expenses which have been incurred, and will and may in the future be incurred, for

treatment of the injuries as a result of the accident.

"Now, after considering all of these elements, if you find for the plaintiff—I point out to you that you do not arrive at this portion of the case until you have first been satisfied by a fair preponderance of the evidence that the defendant was negligent, and that his negligence was the proximate cause of the accident, but if you so find, then in assessing damages you should allow such damages as will fairly and justly compensate the plaintiff for the injuries, losses, and disabilities, which she has sustained as the result of the accident."

The landlords excepted to this instruction because they contended that there was no legally sufficient evidence in the case "to show a continuing requirement of treatment or medication for the child, and there is no evidence in the case legally sufficient to show that there is any permanent disability, or any permanent injury as a result of the accident."

Dr. Frank Schuster, a specialist in neurology and who treated Zella, testified that after Zella had suffered convulsions some six months after the accident, she underwent electro-encephalogram tests and pneumo-encephalogram tests at the University Hospital. In reviewing these tests, as well as the medical records at Franklin Square Hospital where Zella was treated immediately after the accident and after examining Zella, herself, he arrived at a diagnosis. He stated:

"Well, it certainly led us to feel as strongly as we possibly could we were dealing with some form of post-traumatic seizure disorder."

Dr. Schuster had previously testified:

"Q. As a result of the EEG, Doctor, what is the significance of the findings as you have related them? A. Well, the significance showed there was definite slow wave activity on the left

side, which would be considered abnormal for that child's age at that time.

"Q. Do you mean brain damage, Doctor? A. It would be interpreted as indicative of brain damage, yes."

He stated later that in considering Zella's history:

"Therefore, although I cannot be certain I must state that the probability exists that the trauma and subsequent seizure disorder could be related. That is about as much as I could really say about the case I stated."

Still later, Dr. Schuster testified:

"Q. Doctor, do you have an opinion that you can state with reasonable medical probability as to whether or not these injuries are calculated to be permanent?

"(Mr. Andrew) Objection.

"(The Court) Well, let's get the answer first. Do you have an opinion, Doctor? A. As to the probability of its resulting from the injury?

"Q. (Mr. Beachemin) Its being permanent? A. Being permanent. I think because of the clinical changes on the air study that there is a good chance there may be some permanent injury, although I cannot be sure, and the only way one would ever really know is to do a follow-up air study later on, which is not a procedure that one would do. There's a definite hazard in doing a repeat air study. And just to find out what is going on, unless you run into trouble of course—unless there are clinical changes."

\* \* \*

"Q. Doctor, from your history you have taken, and your examination of this child, and your review of the hospital records, can you state

whether or not with reasonable medical probability this child can be classified as an epileptic? A. If you use those terms?

"Q. Yes, that term. A. Yes, sir.

"Q. And could you state, Doctor, whether that is a permanent condition? A. That is difficult to really state, as I say we have a long period yet to go during puberty, and so forth, to see whether or not this reoccurs. Now, I would say that 50 per cent of the patients who have these seizures, whatever the cause may be, will have them for the rest of their lives, but another 50 per cent may not have them, and would disappear."

In deciding whether the jury should be instructed that there was no evidence from which it could find that Zella had suffered permanent injuries the trial court should resolve in her favor all conflicts in the evidence, should assume the truth of all evidence and all inferences that may naturally and legitimately be deduced from the evidence which tend to support her right to recover for permanent injuries. *Baer Brothers v. Keller,* 208 Md. 556, 558, 119 A. 2d 410, 411 (1956).

Applying this approach to the facts, we are of the opinion that the trial court properly declined to charge the jury that there was no legally sufficient evidence that Zella had suffered permanent injuries. Dr. Schuster's testimony was, in our opinion, more certain and definite in regard to the causal connection between the trauma resulting from the accident and Zella's injuries than was the testimony of the attending physician who testified for the plaintiff in *Hughes v. Carter,* 236 Md. 484, 204 A. 2d 566 (1964) which this Court held to be sufficient to warrant the submission of causal connection to the jury.

There was also, in our opinion, sufficient evidence of permanency of Zella's injuries. From Dr. Schuster's testimony, it appears that Zella, with reasonable medical

probability, can be classed as an epileptic. He testified that it would be necessary to wait until puberty to see whether epileptic seizures occur and that 50% of the patients who have them, have them for the rest of their lives. Under all of the circumstances, it was for the jury to determine whether Zella's injuries were permanent. The trial court properly instructed the jury in this regard.

### (b)

Finally, the landlords contend that the trial court incorrectly charged the jury in regard to the duty of the landlords to repair. The trial court instructed the jury on this matter, as follows:

> "Under the Common Law there is no duty on the part of the landlord to make repairs to a premises which he rents to a tenant unless there is some specific agreement by him to make repairs, but there can be a duty and duty will arise on his part under certain circumstances, even if there is not even a written or specific agreement to make repairs. If there is in fact a defective condition in the premises such as the condition which has been testified to in this case, and if the evidence shows that the landlord was given notice that this condition existed, and if the landlord agrees to repair that condition, and on the strength of that promise the tenant remains on the premises and continues to stay there and pay the rent, but if the landlord fails, after having been given reasonable notice and having had a reasonable opportunity to make the repairs, if he fails to do so, and as a consequence the tenant is injured because of that failure, then this would constitute an obligation on the part of the landlord, and would render him negligent for such failure."

The landlords excepted to this portion of the charge on the grounds that (1) there was no evidence that the

tenant remained on the premises relying on the promise to repair and there was no showing of the payment of rent between the time of the promise to repair and the date of the accident and (2) there was no evidence of any consideration to support the promise to repair.

We have already considered these questions under the discussions in regard to the denial by the trial court of the landlords' motions for a directed verdict and for a judgment n.o.v., or, in the alternative, for a new trial. As we have indicated, there was, in our opinion, sufficient evidence of consideration for the promise of the landlords to repair. There was no prejudicial error in the trial court's instruction in this regard.

*Judgment affirmed, the appellants to pay the costs.*