Jonathan E. **MUENSTERMANN, A Minor, by his mother and next friend, Margaret A. Muenstermann and Margaret A. Muenstermann, Plaintiffs,**

v.

**UNITED STATES of America Defendant.**

**Civ. No. N–89–427.**

United States District Court, D. Maryland.

Feb. 20, 1992.

Gerard E. Mitchell, Christopher Mitchell, and Stein, Mitchell & Mezines, Washington, D.C., for plaintiffs.

Dale P. Kelberman, Beth P. Gesner, and U.S. Atty., D. of Md., for defendant.

## MEMORANDUM OPINION

NORTHROP, Senior District Judge.

## I. INTRODUCTION

Plaintiffs, Jonathan Muenstermann, a minor, and his mother Margaret Muenstermann, both as mother and next friend, bring this suit against the Government under the Federal Tort Claims Act ("FTCA"). 28 U.S.C. § 1346(b), 2671–2680. Gerard E. Mitchell and Christopher Mitchell represented the Plaintiffs. Counsel for the government were Dale Kelberman and Beth P. Gesner. The case was well presented by all the attorneys for both parties.

Jonathan Muenstermann was born on March 16, 1986. At birth, no one knew that Jonathan suffered a severe stroke during labor. The stroke crippled over half of the right side of his brain and caused significant damage on the left side as well. During Mrs. Muenstermann's pregnancy, a series of sonographic examinations revealed that Mrs. Muenstermann suffered at least a partial placenta previa, a condition which precludes even attempting a vaginal delivery. Mrs. Muenstermann was admitted to Malcolm Grove Medical Center on February 25, 1986 for observation. Although the sonograms indicated a partial placenta previa, Mrs. Muenstermann's doctors did not make that diagnosis.

As an additional complicating factor, Mrs. Muenstermann tested positive for anti-kell antibodies and anti-E antibodies during her pregnancy. Because of the risk of blood type incompatibility between the mother and child, Mr. Muenstermann's blood was also tested. As the Government freely admits, Mr. Muenstermann was given the wrong blood test. The right blood test would have revealed Jonathan's blood incompatibility with his mother. Upon admission to Malcolm Grove, Mrs. Muenstermann's pregnancy had two separate problems, the first, at least a partial placenta previa and the second, the blood incompatibility between mother and fetus.

On March 11, 1986, while Mrs. Muenstermann was at Malcolm Grove, her doctors attempted to induce labor. Medical records indicate that Mrs. Muenstermann's doctors attempted to induce labor beginning around 9:15 a.m. They suspended their efforts about ten hours later as the monitoring of Jonathan's heart disclosed certain irregularities. These irregularities should have alerted Mrs. Muenstermann's doctors to the fact that vaginal delivery should not have been attempted. But they did not. Five days later, on March 16, 1986, at 4:00 a.m., Mrs. Muenstermann went into active labor. The Medical records indicate that heart monitoring once again revealed certain irregularities that once again should have alerted the doctors that the fetus was in trouble. In the face of these warning signs, Mrs. Muenstermann's doctors artificially ruptured the fetal membrane twelve hours after Mrs. Muenstermann's labor began. Immediately after the artificial rupture of the membranes, Jonathan's heart rate severely dropped. A crash caesarean section was performed at 4:25 p.m., resulting in the delivery of Jonathan Muenstermann.

At birth, Jonathan was almost ten pounds. Examination revealed that Jonathan was in trouble. So, shortly after his delivery, Jonathan was transferred to Walter Reed Army Medical Center for treatment of hemologic disorders secondary to the anti-kell antibodies and anti-E antibodies. Jonathan remained at Walter Reed for ten days and was discharged on March 26, 1986. At his discharge, Jonathan was described as a healthy appearing male infant with a slight yellow-green tint to the skin. He was considered a problem baby in that he had to be checked for platelet counts, hematocrit checks and bilirubin checks. There were no signs of Jonathan's main problem, the stroke he suffered at birth.

Following Jonathan's discharge from Walter Reed, Mrs. Muenstermann understood that the blood disorder condition had

been completely resolved. Neither Mrs. Muenstermann nor anyone else knew that Jonathan suffered an injury due to acts at Malcolm Grove Hospital.

During one of the subsequent neonatal visits, one of Mrs. Muenstermann's doctors stated to her and her husband that a miscommunication between her doctors resulted in Mr. Muenstermann receiving the wrong blood test. There was no indication from the doctor that either the management or the delivery would have been done any differently than what the doctors had attempted. It was not until that fall that Mrs. Muenstermann noticed that Jonathan was not using his left arm as much as his right. After several visits with the doctor, on December 30, 1986, Jonathan Muenstermann had a CT Scan performed. The CT Scan revealed severe damage to the right side of Jonathan's brain indicating that Jonathan had suffered a stroke at birth.

After learning of her child's brain damage Mrs. Müenstermann sought legal advice in February of 1987. The Government received an administrative claim on April 14, 1988, less than two years after the Muenstermanns learned of the stroke that their son had suffered at birth.

The Government contends that Mrs. Muenstermann's claim is barred by the statute of limitations. According to the Government, the neonatal consultation on April 15, 1986 should have alerted the Muenstermanns to both the cause and injury that Jonathan suffered. The Government also contends that there was no placenta previa. Finally, the Government argues that if there were a placenta previa, it was not reasonably foreseeable that Mrs. Muenstermann's doctors should have diagnosed it.

There is virtually no dispute about the existence or the severity of Jonathan's injuries. The destruction of the right side of the child's brain is indisputable, and in fact, discovered by Defendants' own employees when they took the CT Scan. No development since the injury warrants any conclusion other than severe, permanent brain damage.

A five day non-jury trial was held beginning on November 18, 1991. Testifying for the Plaintiff were both Mr. and Mrs. Muenstermann, the child's parents, Mrs. Ruth Moorer who runs a day care center where the Muenstermann children, including Jonathan, attend, and Doctor David Owen, Jonathan's pediatric neurologist. Plaintiffs' expert witnesses included Doctors Joel M. Palmer, and James A. O'Leary, two obstetrician-gynecologists and Doctors Sherwin Kevy, a pediatrician and pediatric hematologist and Robert Clancy, a pediatric neurologist. Plaintiffs' expert witnesses also included Doctor Raphael Minsky a rehabilitation psychologist and Mr. Phillip Bussey a rehabilitation counselor. Finally, Plaintiff had Mr. Richard Lurito testify as Plaintiffs' Expert Economist.

For the Defendant, Doctor Judith Gurdian, the gynecologist who delivered Jonathan, testified. Defendant also had Mr. John Scarbrough testify as Defendants' Expert Economist.

## II. LEGAL ANALYSIS

### A. Findings of Fact

#### 1. Statute of Limitations

Jonathan's birth on March 16, 1986 at the Malcolm Grove Medical Center was accomplished by a "crash" caesarean section. The infant experienced bradycardia or decreased fetal heart rate which resulted from the efforts of Mrs. Muenstermann's doctor to induce labor. Jonathan was found at birth to have problems related to a blood disorder caused by his mother's production of anti-kell and anti-E antibodies. The antibodies from the mother's blood caused a destruction of the red blood cells in the fetus. In an effort to defend itself, the fetus releases immature red blood cells or "erythroblasts" into the fetal circulation system. This creates bilirubin, which is normally eliminated through the mother's system. After birth, however, the bilirubin builds up in the newborn's system.

Rated as seriously ill, Jonathan was transferred to Walter Reed Army Medical Center where he could receive transfusions and neonatal intensive care. The problems

from Jonathan's blood disorder were effectively treated with a double volume exchange transfusion with packed red blood cells, platelet transfusions, and oxygen. Throughout his stay at Walter Reed, Jonathan's brain damage, which both parties and all testifying experts agree occurred at birth, was not discovered. According to Dr. Clancy, a pediatric neurologist, the Walter Reed Hospital records revealed that Jonathan was described as neurologically normal. Upon his release from Walter Reed, Mrs. Muenstermann was told that Jonathan only needed additional monitoring for platelet counts, hematocrit checks and bilirubin checks. Mrs. Muenstermann testified that it was her understanding that there were no other disorders or injuries.

Nevertheless, on April 10, 1986, Dr. Rouse, Mrs. Muenstermann's family practitioner, informed the Muenstermanns of a miscommunication between him and the obstetrician who delivered Jonathan, Dr. Gurdian. As a result of the miscommunication, Mr. Muenstermann was given the wrong blood test to determine if Jonathan was in jeopardy, because of Mrs. Muenstermann's abnormal anti-kell antibody. According to Dr. Kevy, who specializes in both children's diseases and children's blood diseases, the government physicians treating Mrs. Muenstermann during her pregnancy breached the standard of care when they did not test Mr. Muenstermann to determine if his red blood cells contained the kell antigen.[1] Instead, Mr. Muenstermann's serum was tested for the kell antibody.

At the April 10, 1986 meeting, Dr. Rouse revealed that the administration of the wrong blood test lead the doctors to conclude that the fetus was out of danger. If the proper test had been given, amniocentesis might have been performed and this might possibly have led to an intrauterine transfusion. Noticeably absent from Dr. Rouse's discussion was any mention of a placenta previa, a separation of the placenta at the time of delivery, or that a planned

caesarean section might have been indicated to prevent fetal distress. In the subsequent months, the bilirubin checks were carried out and Jonathan was repeatedly found to be a normal infant.

It was in the fall of 1986, more than six months after Jonathan's birth, that Mrs. Muenstermann first noticed that her newborn son was not using his left hand as much as his right hand. Mrs. Muenstermann testified that up until that time his doctors said Jonathan was healthy and according to her own observations, he seemed to be doing fine. At these first indications of trouble, Mrs. Muenstermann took Jonathan to Malcolm Grove for several examinations. Mrs. Muenstermann testified that Dr. Cohen, head of the pediatric department at Malcolm Grove, stated that although he believed that Jonathan's problems with his left arm were not serious, he would arrange for a CT scan. It was on December 30, 1986 that Jonathan's CT scan revealed the infant's brain damage. Dr. Cohen informed Mrs. Muenstermann of the results and after additional examination of Jonathan and consultation with the Muenstermanns, Dr. Cohen diagnosed Jonathan's brain damage as cerebral palsy. It was Dr. Cohen, Mrs. Muenstermann testified, who, after consulting with the Muenstermanns, first suggested that they seek legal advice. Mrs. Muenstermann sought legal advice and filed an administrative claim which was received by the government on April 14, 1988. These facts are largely undisputed.

■ What is in dispute is the cause of Jonathan's brain damage and the relationship between Jonathan's brain damage and the known problems he suffered at birth. At the outset, this Court finds that the Muenstermanns neither actually knew of their son's brain damage, nor was it reasonable for them to have known of Jonathan's brain damage until the CT scan revealed it on December 30, 1986. Mr. and Mrs. Muenstermann's testimony was credi-

---

1. The government does not contest the negligence of the doctors with respect to the miscommunication over the test Mr. Muenstermann was given. Instead, the government hopes to evade any liability by admitting this negligence which the Muenstermanns knew about for over two years.

ble and persuasive on their actual knowledge. Both testified that they were unaware of any brain injury until the CT scan was taken. Further, this Court finds that nothing in what the parents were told by the doctors at Malcolm Grove or Walter Reed or what the parents could have learned through observing Jonathan would have led a reasonable person to suspect that the infant was brain damaged. This factual conclusion is based on the hospital records and the expert opinions at trial. None of the hospital records indicate any evidence of brain damage before December 30, 1986. There are no records indicating that Jonathan's doctors, Rouse and Gurdian, ever suspected, much less, told the Muenstermanns that Jonathan suffered brain damage. As already mentioned, Dr. Clancy's examination of the Walter Reed Hospital records revealed that the doctors there found Jonathan neurologically normal.

Testimony from Plaintiffs' expert in pediatric neurology, Dr. Clancy, and their expert in pediatric hematology, Dr. Kevy, both conclude that Mrs. Muenstermann's failure to notice any deficiencies in Jonathan that would indicate brain damage until the Fall of 1986 was reasonable. The reasons for their conclusions are simple and persuasive. First, as Doctors Clancy and Kevy testified it is not unusual for the type of brain damage Jonathan suffered at birth, an infarction, a destruction of brain tissue, to go unrecognized for many months after birth. As Dr. Clancy stated, newborn infants are not capable of moving their arms in a skillful, deliberate, voluntary way. It is only later when expectations grow for maturing babies to demonstrate greater physical control over their movements that the effects of brain damage are noticed. Second, coupled with the difficulty in discerning the damage since Jonathan's doctors did not actually diagnose an infarct, it would be unreasonable to foist that responsibility onto Mrs. Muenstermann. This Court finds that exercising reasonable care, as Mrs. Muenstermann did, would not, nor should not, have revealed Jonathan's injury. The brain damage was not discovered nor was it reasonable to have discovered the injury until the December 30, 1986 CT scan.

 The Government maintains that even if the Muenstermanns did not know the full extent of their son's injury, they were aware of one of the actual causes, Jonathan's erythroblastosis fetalis, a condition caused by the mother's and fetus' incompatible kell antibody factors. According to the Government, Jonathan's blood disorder bears a causal relationship to his brain damage. In support of their position, the Government cites Plaintiffs' own expert on obstetrics and gynecology, Dr. O'Leary. Dr. O'Leary testified on cross examination that absent the blood incompatibility, Jonathan's infarct would not have occurred. The obstetrician stated that the blood disorder resulted in anemia, which predisposed the infant to the brain injury.

On redirect, Dr. O'Leary attempted to clarify his position when he claimed that the blood disorder and the resulting anemia only led to Jonathan's predisposition to the infarct by reducing his ability to tolerate the stress of the separation of the placenta. According to Dr. O'Leary, Jonathan's delivery called for a caesarean section and because it was not timely performed, the blood disorder only made it more likely that the brain injury would occur.

Plaintiff countered with the testimony of two expert witnesses. Dr. Clancy, a pediatric neurologist, testified that Jonathan's brain injury was the result of ischemia, a reduction of blood flow, and hypoxia, a reduction in the oxygen to the fetus. Dr. Clancy states that it was the separation of the placenta and the resulting hemorrhaging that caused a reduction in both blood flow and oxygen that culminated in the infarct. This testimony, when weighed against Dr. O'Leary's, might have the Court equiposed as to the blood disorder's causal relationship to the brain injury.

It could be that both the separation of the placenta and the blood incompatibility bear a proximate causal relationship to the brain injury. Nevertheless, this Court finds that Dr. Kevy's testimony tips the

balance away from the blood disorder's having any causal relationship to Jonathan's infarct. Although all of the witnesses were credible and greatly informative, Dr. Kevy's specialty is pediatric blood disorders and his testimony on this point carries great weight. Dr. Kevy testified that Jonathan's brain injury was in no way associated with the erythroblastosis fetalis. Like Dr. Clancy, Dr. Kevy maintained that it was the separation of the placenta that prevented the infant's brain from receiving sufficient oxygen and blood, thus causing the infarct. Dr. Kevy based his opinion on several facts. First, he testified that the erythroblastosis fetalis does not, in his experience, produce the severity of brain injury that Jonathan suffered. Second, erythroblastosis fetalis, if not detected, would produce an injury in an entirely different portion of the brain. Third, the erythroblastosis fetalis that Jonathan had did not cause his anemia, for Jonathan neither had the hydrops fetalis or swelling, nor did he have a large number of nucleated red blood cells. Both are associated with anemia. According to Dr. Kevy, Jonathan's low nucleated red blood cell count is more indicative of a type of anemia caused by bleeding of a short duration which is contrary to erythroblastosis fetalis.

Therefore, this Court finds by a preponderance of the evidence, that Jonathan's blood disorder was not likely to have been caused by, nor was a substantial factor in causing Jonathan's brain damage. As a result, the miscommunication between Doctors Rouse and Gurdian bears no causal relationship to the brain injury. Even if Mr. Muenstermann received the proper blood test, and the alternative measures that Dr. Rouse outlined at the April 10, 1986 meeting with the Muenstermanns had been taken, the brain injury would still have occurred. Neither the blood disorder, the miscommunication, nor the resulting misdiagnosis of the infant's blood affected his brain damage. They are simply not the cause, nor even a factor.

■ The parties also dispute whether brain damage suffered by Jonathan at birth is just another effect of the blood disorder or whether it is a completely separate injury. The Government contends that the infarct at birth which destroyed the infant's brain cells is simply another effect of the blood disorder. To make this argument, the Government relies on two unsupported assertions: first, that Jonathan's anemia is an injury, as opposed to an underlying condition that predisposed the infant to the brain injury, and second, that because all of these "injuries" occurred at birth, they are all related. It is a type of reasoning that lumps events together solely on the basis of their temporal relationship. Because all "injuries" occurred at roughly the same time, the Government asserts they must share causes and be a result of the same underlying injury. But there is no basis in the testimony for the Government's conclusion.

All of the expert witnesses who testified on this point separated the anemia Jonathan suffered from the brain injury. Dr. Clancy stated that the anemia was an illness or a condition that placed greater stress on the infant. The infarct or stroke was the actual injury. Similarly, Dr. O'Leary defined the anemia and the blood disorder as a condition predisposing the infant to the injury. By itself anemia is not an injury. Consequently, this Court finds that the infarct or brain injury could not have been a different effect of the same injury because neither the blood disorder nor the anemia constitutes an injury.

What is even more persuasive, though, than an argument over medical definitions and classifications is the relationship between the blood disorder which the Muenstermanns knew about when Dr. Rouse told then on April 10, 1986, and the brain injury. Even if the anemia or the erythroblastosis fetalis could be classified as an injury, it would be odd to view an unforeseeable brain injury as merely a different effect of the blood disorder. If the brain injury is really an additional effect from the blood disorder, then it should be foreseeable that a particular effect will follow from this injury. Under the Government's theory, the blood disorder and the anemia should have alerted the attending physician to the brain damage. But, it did not. Jon-

athan's injury only began to manifest itself when the infant could not perform tasks expected of newborns. Since this Court has already held that it was reasonable for the Muenstermanns not to have discovered the brain damage until the December CT scan, this Court finds that the injuries are completely unrelated. This conclusion is further supported by this Court's previous finding that the erythroblastosis fetalis is not a cause of the brain injury or the anemia that Jonathan had at birth.

## 2. Negligence

### a) *Standard of Care*

In essence, Plaintiffs argue that Defendant breached the standard of care by failing to adequately diagnose that Mrs. Muenstermann had placenta previa. Further, Plaintiffs claim Defendant mismanaged the labor and delivery of Jonathan. After failing to diagnose the placenta previa, Defendant attempted a vaginal delivery by inducing labor and this caused the predictable results of a separation of the placenta from the wall of the uterus, which caused Jonathan's stroke or infarct.

Instead, Mrs. Muenstermann's diagnosis required a timely caesarean section. By way of explanation, as Plaintiffs' witnesses, Doctors O'Leary and Palmer, who are expert in obstetrics and gynecology, stated, the placenta is attached to the muscular wall of the uterus by a vascular network. If the placenta separates from the wall of the uterus, the fetus can suffer increased distress, and an infarct or stroke can result, as the separation deprives the fetus of blood, oxygen, food and waste removal. A placenta previa can be particularly damaging. In a placenta previa, the placenta covers (fully in the case of a complete or central previa or partially in case of a partial previa) the cervix or os. As the cervix dilates, the underlying muscular tissue disappears and there is no longer an attachment of the placenta to the wall of the uterus, thus causing the problems associated with separation.

Defendant contends that Mrs. Muenstermann did not have a placenta previa.[2] Further, if Mrs. Muenstermann did have a placenta previa, it was reasonable for Dr. Gurdian not to know of its existence. Her failure to diagnose the placenta previa was reasonable in light of the circumstances.

At the outset, it is important to note that three key factual issues are not in dispute. First, both parties agree that attempting a vaginal birth in the face of a placenta previa would be a violation of the medical standard of care. Plaintiffs' witnesses, Dr. O'Leary and Dr. Palmer, both stated that the standard of care requires a timely caesarean section to guard against the separation of the placenta when a mother is diagnosed as having a placenta previa. Similarly, Dr. Gurdian, the government doctor who delivered Jonathan, agreed that a caesarean section is required if the mother has a placenta previa.

Second, it is undisputed that Mrs. Muenstermann suffered a separation of the placenta from the wall of the uterus prior to birth. Plaintiffs witnesses, Doctors O'Leary, Palmer, Clancy, and Kevy, all testified that from their reading of the records, there was a separation of the placenta, and Dr. Gurdian's own operation report (Exhibit 15) states, "[t]he placenta was noted to be spontaneously separated with a large amount of blood behind the placenta."

Third, it is undisputed that Jonathan was under great stress just prior to his birth. Doctors O'Leary and Palmer state that other readings of the hospital records indicate this diagnosis.

According to these doctors, the deceleration of the fetus' heart rate, and then the precipitous fall in heart rate, the presence of meconium in the amniotic fluid and the large amount of blood found behind the placenta all indicate fetal stress. Further, Dr. Gurdian's operation report (Exhibit 15), and her testimony support this conclusion. In fact, it was the dramatic drop in Jona-

---

**2.** As explained in the Statute of Limitations section, Defendant argues that the known cause of the stroke was Jonathan's blood disorder. Since this Court has already dispensed with those arguments, we need not dwell on them again, for the Court has found that the blood disorder did not cause the stroke.

than's fetal heart rate after the attempted induction of a vaginal delivery, that finally alerted Dr. Gurdian that a crash caesarean section was needed to save the baby.[3]

The significance of these factual conclusions is that an attempted vaginal birth when a placenta previa is present can cause a separation which can lead to a stroke. Jonathan was under severe distress when labor was induced and his placenta did in fact separate. The issues are narrowed and three questions remain. Did Mrs. Muenstermann have a placenta previa? If so, should Dr. Gurdian have made that diagnosis and not induced labor? And, finally, if Mrs. Muenstermann had a placenta previa, did Dr. Gurdian's action cause the placenta to separate from the uterus causing Jonathan's stroke or infarct to occur?

### b) *Breach*

This Court finds by a preponderance of the evidence that Mrs. Muenstermann did have a placenta previa. The evidence of at least a partial placenta previa is overwhelming. First, the four sonograms that Mrs. Muenstermann had prior to Jonathan's birth had indicated the presence of a partial previa. Mrs. Muenstermann's first two sonograms on September 26, 1985 and November 26, 1985 show the placenta as posterior and low lying. The sonographic report states the need for more follow up.

While Plaintiffs' expert witnesses O'Leary and Palmer both agreed that these sonographic reports do not state that there is a previa, the witnesses agreed that they do suggest cause for concern and the patient should have been monitored. Doctor Palmer stated that there are two types of placenta previa—anterior and posterior, low lying. According to Dr. Palmer, the posterior, low lying placentas, such as Mrs. Muenstermann had, are far less likely to migrate away from, or clear, the cervix as the fetus matures. The third sonogram on January 23, 1986 and the four sonograms

on February 23, 1986 state that the posterior placenta extended down to the internal cervical opening. These last two sonograms clearly indicate the presence of at least a partial placenta previa, according to Doctors O'Leary and Palmer.

According to Dr. Palmer, to a reasonable degree of medical certainty, a caesarean section at 36 to 38 weeks of the pregnancy is the proper procedure. Any attempted vaginal delivery under these conditions is below the standard of care. Doctor O'Leary stated that these sonograms are between 90 to 98% reliable and that the multiple sonograms such as Mrs. Muenstermann had are cumulatively even more reliable.

To counter the sonogram reports, Defendant notes an apparent inconsistency between the third and second sonogram. While the second sonogram indicated a possible marginal previa, the diagnosis from the third one shows at least a partial previa, yet the third sonogram states that there is no change in the position of the placenta. Dr. Gurdian, in her testimony, went even farther in attacking not only the inconsistency of these sonograms but also the reliability generally of sonograms done at Malcolm Grove. If the sonograms are done on a full bladder, according to Dr. Gurdian, they may indicate a placenta previa where there is none. Because Dr. Gurdian believed there was an inconsistency in the results of the four sonograms, she performed her own, a different type of sonogram called real time sonogram. Neither her real time sonogram, nor a subsequent vaginal finger examination of Mrs. Muenstermann on March 4, 1986 revealed, in her view, the presence of a partial placenta previa.

This Court is not persuaded by Dr. Gurdian's testimony. Plaintiffs' witnesses were, on balance, more credible. First, both Doctors O'Leary and Palmer stated

---

**3.** Exhibit 15, Doctor Guardian's operation report, indicates the poor, persistent heart rate variability and deceleration. "Artificial rupture of the membranes was performed revealing approximately 3 liters of particulate thick meconium amniotic fluid.... Approximately, 5–6 minutes after rupture of the membranes was performed, the infant was noted to have a precipitous fall in heart rate from 140 range to 30 range.... The patient was rapidly taken back to the delivery suite where a rapid cesarean section was performed under general anesthesia." Exhibit 15.

that the sonogram reports were not inconsistent. As the pregnancy advances, the radiologist examining the sonogram gets a better view of the placenta. Second, the sonograms clearly indicated a placenta progressing towards, not away from, the os. This finding is consistent with Dr. Palmer's testimony that posterior placenta previas such as Mrs. Muenstermann's, are less likely to migrate away from the cervix.

Third, both Doctors Palmer and O'Leary drew a different conclusion from Doctor Gurdian's March 4, 1986 report of her vaginal examination. Both doctors said that the report should have indicated great cause for concern since the placenta was felt right at the edge of the os. As both Doctors O'Leary and Palmer testified, as the cervix dilates, the placenta would move over it. Therefore, even a marginal previa can become a partial previa causing the separation of the placenta from the uterus. However, their reading of Doctor Gurdian's March 4, 1988 report indicates a partial placenta previa, which would require a caesarean section in order to be within the standard of care. Instead, Doctor Gurdian ignored these signs.

Fourth, this Court is unpersuaded by Defendant's attempts to impinge the credibility of the four sonograms by attacking the reliability of sonograms at Malcolm Grove. This argument may help explain Doctor Gurdian's actions in taking another real time sonogram, but it does not deflect liability. If true, it might only diffuse responsibility for the misdiagnosis within the Government. Also, this Court is unpersuaded that the sonograms are unreliable, because, insofar as the Government never developed this point but merely raised it in unsupported assertions in questions on cross examination and a few remarks by Dr. Gurdian.

Finally, the fact that Dr. Gurdian's own real time sonograms did not alert her to the placenta previa is also not persuasive. Doctors Palmer and O'Leary stated that when a physician asks for a sonogram, he is really consulting with an expert in the field of radiology. The obstetrician is relying on the expert diagnosis of the radiologist who evaluates the sonograms for the fetus' growth and position. Doctor Palmer stated that it was below the standard of care for an obstetrician, based on her own real time sonogram, to override the sonographer's multiple detailed evaluations. This Court is persuaded that by a preponderance of the evidence, the sonograms indicated the presence of at least a partial placenta previa.

Defendant counters the sonograms by pointing out that other symptoms that frequently accompany a placenta previa were not evident. Dr. Gurdian testified that she did not believe that placenta previa existed because Mrs. Muenstermann did not exhibit one of the common signs, vaginal bleeding. However, as Doctor O'Leary pointed out, while bleeding frequently accompanies a placenta previa, the blood may, as it was in this case, be caught behind the placenta. (See Exhibit 15—Dr. Gurdian's operation report noted blood behind the placenta indicating hemorrhaging at delivery.)

There were other factors in addition to the sonograms that Mrs. Muenstermann's doctors ignored that indicated a placenta previa. Both Doctors O'Leary and Palmer stated that from their evaluation of the records, the fetus' head was ballottable or floating and not engaged in the cervix. When a fetus is ready for delivery, the head is fixed in the pelvis. Here, the head was floating because something else was occupying that space, i.e. the placenta. As already mentioned, the March 4, 1986 vaginal examination should have indicated that a vaginal delivery would not be possible because of the placenta previa.

While the presence of a placenta previa alone requires a timely caesarean section, Plaintiffs' expert witnesses suggested other factors that should have alerted Mrs. Muenstermann's doctor not to induce vaginal delivery. Jonathan was a heavy baby, weighing close to ten pounds at birth. His size would have created greater stress during vaginal delivery. Second, a fetus' floating head is another indication that delivery is not ready. Third, polyhydramous or too much fluid circulating around the fetus in the amniotic membrane. *See* Ex-

hibit 15. Fourth, Dr. O'Leary stated that the blood disorder increased fetal stress during vaginal delivery.

Finally, and perhaps as the greatest indication beyond the placenta previa that a vaginal delivery should not have been attempted, the Court looks to Jonathan's fetal heart beat. Until labor was induced on March 16, 1986, Doctors O'Leary and Palmer testified that Jonathan had good beat to best variability. As contractions occurred, the heart speeds up and then gradually returns to normal. Jonathan's fetal monitoring strips (Exhibit 6) and the March 16 operation report (Exhibit 15), however, both indicate that the contractions were causing deceleration in the heart rate with the final dramatic one alerting Doctor Gurdian that Jonathan was severely distressed. According to Doctors O'Leary and Palmer, the heart deceleration or the lack of good beat to beat variability should have alerted Doctor Gurdian much earlier that Jonathan's system was not compensating for the stress he was under. Instead, it did not.

Plaintiffs' Exhibits (the sonographic reports and Doctor Gurdian's own reports) as well as the testimony of expert witnesses, all strongly support the conclusion that Mrs. Muenstermann had a placenta previa. Therefore, in view of those exhibits and testimony, this Court, by a preponderance of the evidence, concludes that Mrs. Muenstermann had a placenta previa.

This Court finds by a preponderance of the evidence that Dr. Gurdian should have diagnosed placenta previa and, therefore, performed a timely caesarean section at least one to two weeks prior to Jonathan's delivery. All of the overwhelming evidence strongly suggested presence of a placenta previa. All of this evidence was available to Dr. Gurdian. All of Plaintiffs' expert witnesses who testified on this point agreed that Dr. Gurdian breeched the standard of care by failing to make this diagnosis. Further, according to Mrs. Muenstermann's testimony, she was told after the fourth sonogram that she had placenta previa. In fact, her testimony stands in conflict with Dr. Gurdian's, as Mrs. Muenster-

mann claims that Dr. Gurdian informed her of the placenta previa after the Doctor performed her own real time sonogram.

This Court finds the testimony of these witnesses credible. Nevertheless, even without this testimony, in view of the information that Dr. Gurdian had at her disposal, this Court concludes that Doctor Gurdian should have diagnosed a placenta previa and performed a timely caesarean section and not induced labor. This court finds that failure to make the proper diagnosis is to be below the standard of care for a physician under these circumstances.

This Court turns to the efforts of Dr. Gurdian to induce labor. Given the presence of the placenta previa, this Court finds that these efforts at vaginal delivery were below the standard of care. In particular, the Court notes three actions by Dr. Gurdian to induce a vaginal delivery that are below the standard of care for a physician under these circumstances.

The first attempt to inducing labor occurred on March 11, 1986 when Pitocin was administered to Mrs. Muenstermann. As noted earlier, Jonathan's head was ballottable. This should have signaled that he was not ready for delivery and that the placenta was the mass occupying the space where the baby's head should have been. Dr. Gurdian's administration of Pitocin did not advance the labor, and according to Doctors Palmer and O'Leary was a breach in the standard of care. The second breach in the standard of care in Jonathan's labor and delivery occurred when Dr. Gurdian applied fundal pressure to bring about the descent in the fetal head. Fundal pressure is when the doctor places her hands on the mother's pelvis and physically presses down. When these efforts failed, Dr. Gurdian ruptured the amniotic membrane which sent the amniotic fluid rushing out and was the final act that caused the stroke.

Plaintiff's witnesses testified that from their reading of the records, both the application of fundal pressure and the rupturing of the membrane were done in the face of clear indications that Jonathan was under stress. For over four hours prior to deliv-

ery, Jonathan's heart showed poor beat to beat variability and variable decelerations. It was shortly after the membrane was ruptured that Jonathan's heart rate dropped to such an extent that Dr. Gurdian was forced to do a crash caesarian section on Mrs. Muenstermann in order to save the baby. By then, according to Doctors Palmer, O'Leary, Clancy and Kevy, Jonathan had already suffered the stroke. As the amniotic fluid came rushing out and the fetal head descended, the placenta separated from the uterus resulting in the ischemia and hypoxia. Jonathan's brain did not have sufficient blood or oxygen.

### c) *Causation*

Doctors Palmer, O'Leary, Clancy, and Kevy testified that the stroke occurred at birth. Their conclusion is based on their examination of the records that indicate that up until March 16, 1986, Jonathan's heart rate was sound. In addition, as Defendants concede, the records indicate that Jonathan was under severe stress at birth. Jonathan's poor heart rate and the presence of large amounts of meconium bear this conclusion out. So does the testimony of Dr. Kevy who stated that Jonathan's low nucleated blood cell count was more in keeping with the bleeding of short duration. Since the bleeding happened quickly, it is reasonable to conclude, given the known consequences of a placenta previa, that it was brought on by Dr. Gurdian's attempt at vaginal delivery. Finally, as Dr. Clancy stated, the presence of large amounts of blood trapped behind the placenta was another indication of the stress Jonathan was under at birth.

■ Given the testimony of the expert witnesses, the known severe stress that Jonathan suffered at birth and the known consequences of a placenta previa, this Court finds by a preponderance of the evidence, Jonathan's stroke was caused by a separation of the placenta from the uterus at birth. Further, this Court finds by a preponderance of the evidence that Dr. Gurdian's efforts to induce labor in the face of Mrs. Muenstermann's placenta previa played a substantial factor, or more likely than not, caused the placenta to separate from the uterus. As Dr. Palmer testified, if Mrs. Muenstermann had a caesarian section performed when she was first admitted to the hospital in late February of 1986, the placenta would not have separated, and the stroke would not have occurred.

This Court finds that the stroke was a foreseeable result that could have been avoided if the diagnosis and delivery of Mrs. Muenstermann's son were performed according to the standard of care for physicians under these circumstances. This Court finds by a preponderance of the evidence that it was the *negligence* of Mrs. Muenstermann's doctors that caused separation of the placenta, which was the cause of Jonathan's stroke at birth.

### d) *Damages*

■ Having determined that Mrs. Muenstermann's physicians' negligence caused Jonathan's stroke, this Court will now examine the damage to Jonathan that resulted from the stroke. The December 30, 1986 CT scan (Exhibit 16) described the organic brain damage to the right side of the brain as "Chronic infarct in the distribution of the right middle cerebral artery ... with associated atrophy or lack of development of the right hemisphere of the brain...." According to Dr. Clancy, Jonathan's middle cerebral artery was damaged and this artery carries the blood and oxygen to that part of the brain.

This diagnosis was confirmed by Dr. Owen, Jonathan's pediatric neurologist in Dallas, Texas. Dr. Owen's EEG of Jonathan in August of 1988 revealed abnormal activity on the right hemisphere of Jonathan's brain.

In addition to the loss of approximately one half of the right hemisphere of the brain, Dr. Clancy testified that there is diffuse damage to the left hemisphere as well. Both Dr. Clancy and Dr. Owen testified the neurological damage is permanent, and the boy's brain cells will not regenerate. This irreversible damage will, according to Dr. Clancy, affect Jonathan's whole life, crippling his personal and educational development, as well as his employment opportunity. This last conclusion was supported by Dr. Owen and Plaintiffs' experts

witness, Dr. Minsky, a rehabilitation psychologist. There is no evidence to contradict these findings and this Court concludes, as it must, that Jonathan's brain damage is permanent.

The physical manifestations of Jonathan's brain damage are apparent in many ways. First, as most of the damage is contained in the right hemisphere of Jonathan's brain, the left side of his body will suffer the greatest impact, according to Doctor Clancy. Doctors Clancy, Minsky and Owen all stated that Jonathan has a severe impairment of the left arm and hand and the left leg and foot. Jonathan holds his left arm in a right angle tightly against his chest, while his hand hangs lifeless and curled at the end of his arm. According to Dr. Owen, Jonathan is ambulatory, but walks with a limp.

Jonathan's physical impairments and the prospects for improvement were tested by Dr. Minsky as well as by experts hired by the government. According to Dr. Minsky, his review of all of these findings shows Jonathan's gross and fine motor skills to be far below those expected of a boy of his age. Dr. Minsky's own adaptive behavior composite examination, testing both gross and fine motor skills, revealed that at almost five and a half years old Jonathan performed with the abilities expected of a two year old. In more concrete terms, Jonathan can not dress or go to the bathroom by himself. Jonathan can take a shoe, a sock or his pants off, but he cannot put them back on. While other children his age are able to do these tasks, Jonathan cannot, or needs assistance.

Jonathan's communicative faculties are also impaired by the stroke. Dr. Minsky's tests demonstrated that Jonathan's communicative abilities are regressing. When Jonathan was forty-one months old, he had the communicative skills of an eighteen month old. However, when he was tested at almost five and one half years old, his communicative skills were at the age equivalent of an eleven month old baby. Dr. Clancy testified that Jonathan is extremely difficult to understand, his abilities being far below those of a healthy child his age.

Jonathan's ability to receive or comprehend information is impaired, but much less so than his ability to communicate. He can understand more than he can share or speak with others. Dr. Minsky testified at five and a half years old, Jonathan had the receptive vocabulary of a child of four.

The effects of Jonathan's stroke are also evident in his cognitive capabilities. Dr. Minsky testified that Jonathan's ability to store and retain simple daily information is greatly impaired. This inability is reflected by impaired short-term memory. His IQ scores, however, range from mildly retarded to low average.

In fact, Dr. Clancy testified that Jonathan is an "uneven child," having severe disabilities in some areas like communication skills while mildly disabled in other areas, such as his IQ. It is Jonathan's disparate abilities that aggravates the emotional and behavioral disorders he suffers. From observation, Dr. Clancy testified Jonathan is inattentive, distractible and noncompliant. Similarly, Dr. Minsky's tests revealed these problems. Jonathan has difficulty socializing with his peers and he is regressing in this area.

The unevenness in his physical abilities and cognitive skills exacerbates his behavior disorder, because Jonathan becomes increasingly frustrated at his own inability to perform tasks most children take for granted. As large as his disabilities are now, they will increase as time goes on. The same factors that hid his stroke from his parents and his doctors for nine months after his birth cloak the full extent of his disabilities. According to Doctors Clancy and Minsky, as life's demands increase, Jonathan's deficits will become more pronounced. He will not be able to keep pace with his peers. His uneven abilities will cripple him in some areas, and he will, to some extent, understand that he is deficient because he is only mildly disabled in other areas.

Although Jonathan continues to progress, Dr. Owen testified that his ability would plateau at that of a ten year old child. Dr. Minsky stated that he would "peak" at an eight or nine year old level.

His social and behavioral skills would regress. As Dr. Minsky stated, this is a somewhat typical profile of a brain-damaged child. Doctors Owen, Clancy, and Minsky all stated that to a reasonable degree of medical certainty, these deficits in his physical, cognitive and behavioral abilities are all permanent and the result of the organic brain damage Jonathan sustained at birth. As such, this Court finds that these damages are the result of the stroke Jonathan suffered at birth.

Having examined the damages to Jonathan as a result of the stroke, this Court will now consider what present and future care needs the boy has that follow as a result of the stroke.

To cope with these deficiencies, Jonathan's present and future needs include: (1) special educational services; (2) attendant care at home as a child and at an adult living center when mature; (3) physical psychotherapy, occupational and speech therapy; (4) certain equipment and supplies; (5) medical services including future surgery; (6) transportation; and (7) annual evaluations. As Doctors Minsky, Owen and Clancy testified, Jonathan will be dependent his whole life. Further, it is unlikely he will be able to secure work in the competitive job market.

Doctor Minsky testimony provided details on the need and cost of many of these items. As a rehabilitation psychologist with a doctorate in special education, Dr. Minsky is well qualified to testify on the educational process and the future care needs of physically challenged children. Dr. Minsky has tremendous experience in developing care and treatment plans analogous to the one prepared for Jonathan. Dr. Minsky's assessment of Jonathan is based on the reports by the physicians who treated and diagnosed Jonathan, reports, and interviews of the child, development specialists who worked with Jonathan, interviews with Mrs. Muenstermann and his own observation and testing. Reliance on these sources is consistent with the multidisciplinary approach to rehabilitation evaluation and planning described by Dr. Minsky and Ms. Bussey. Dr. Minsky's figures are summarized on Plaintiffs' exhibit 23A.

Turning first to the immediate needs, this Court finds that Jonathan requires special educational tutoring. Dr. Minsky testified that to a reasonable degree of medical certainty, Jonathan's physical, behavioral, and cognitive deficiencies require special one-on-one tutoring. Although Jonathan's public school is required by law to provide minimum aid, in Dr. Minsky's opinion, the school is not capable of meeting the boy's needs. Jonathan's uneven abilities exacerbate his behavior problems and make him difficult to work with in group settings. Because of the stroke, he is easily distracted and has difficulty retaining information. Dr. Minsky's conclusion is supported by Dr. Owen's testimony.

Dr. Minsky recommended that a skilled special education teacher work with Jonathan at home five hours a week. According to Dr. Minsky, Jonathan will need this tutoring through age 21, until the end of his formal education. Basing his opinion on his own experience and surveying tutoring costs around the country and in Texas, Dr. Minsky testified that such tutoring would cost $40 per hour. Dr. Owen supported this conclusion as well as the boy's need for five hours of tutoring per week. As such, this Court finds that Plaintiffs' $11,700 yearly cost figure is fair and reasonable in light of the circumstances.

Beyond tutoring, Jonathan needs attendant care. Dr. Minsky testified that Jonathan represents a potential to be dangerous both to himself and others, given his behavioral and cognitive difficulties. Currently, attendant care is being provided by his mother and a family friend who operates a day care center. His present situation will not last if Jonathan hurts himself or another child. While Mrs. Muenstermann is capable of caring for him, Jonathan's demands are great and Mrs. Muenstermann testified that she must also devote time to raising her two other children. Mrs. Muenstermann is a single parent and has returned to school. All of this is hampered by the current care Jonathan

demands. Dr. Minsky stated, that in his experience, the attendant care is needed to keep the family from becoming dysfunctional as the patience of those around Jonathan may grow short as he gets older and his behavioral problems increase.

The attendant care that Dr. Minsky recommended is basic, a home health aide. It is care in helping Jonathan dress, or watching over him after school. Dr. Minsky recommended, and Doctors Owen and Clancy agreed, that a reasonable time estimate for such care would be eight hours per day during school days and sixteen hours per day on non-school days. Jonathan will need this care until the age of twenty-one. According to Dr. Minsky, who received cost calculations from the Dallas area, the attendant care would cost an average of $12.10 per hour. The total yearly cost would be $53,240. This Court finds that the attendant care is necessary, not only for Jonathan, but, also to help out those, *i.e.*, his family, who must work with him the most and are essential to his life. This Court finds that the Plaintiffs' yearly cost estimate to be fair and reasonable in light of the boy's circumstances.

[10] Doctors Minsky, Owen and Clancy all testified that Jonathan will need weekly therapy to better cope with his physical, behavioral and cognitive deficiencies. Dr. Minsky's recommendation was that the once a week sessions in occupational, speech and physical therapy, as well as individual psychotherapy, are the minimum Jonathan requires to meet his needs. The weekly sessions are essential to his developing a beneficial relationship with his therapists so that they can better aid Jonathan. None of this therapy this Court finds is duplicative. Evidence offered at trial demonstrated a particular need for the special tutoring as well as each type of the therapy Plaintiffs request. It is clear from the testimony of Jonathan's doctors and the expert witnesses, that Jonathan stands a reasonably good chance of benefiting from these therapies despite the extreme neurological damages and physical incapacitation he suffered. Although the public school Jonathan attends will provide assistance in some of the areas, Dr. Minsky testified that in light of Jonathan's severe brain damage, this care is reasonable and necessary to supplement to the services Jonathan should receive from the school.

Jonathan will need this care until age twenty-one. Dr. Minsky testified that, based on his research, the hourly rate for this therapy is $57.20. This Court finds that this therapy is necessary and that Plaintiffs' yearly cost figures are fair and reasonable in light of the circumstances.

[11] Dr. Minsky testified that Jonathan will require some equipment to help him speak and comprehend what others are saying. This adoptive communicative device is a two time cost. Jonathan requires some equipment now and some additional equipment at age nine. This Court finds this two time purchase of the adaptive communicative equipment necessary and the Plaintiffs' cost figures of $2,295 per purchase to be reasonable in light of Dr. Minsky's findings.

[12] Jonathan's left hemiparesis will require special computer software and a printer to help him do written assignments and assist him in his therapy. Further, Dr. Minsky testified that the educational software should help him increase his attention span. This Court finds that this equipment is necessary and Plaintiffs' yearly purchase figures are reasonable. *See* chart.

[13] To evaluate Jonathan's progress properly and make recommendations as to future treatment, Dr. Minsky testified that Jonathan will require physical, occupational and speech evaluations yearly through age twelve and yearly educational and developmental evaluations through age fifteen. Jonathan will also require yearly neuropsychological and psychiatrist evaluations and certain medical services through age twenty. These evaluations and medical services are, according to Dr. Minsky, above and beyond the usual pediatric requirements for a normal, healthy child. They are needed as a result of Jonathan's stroke and brain damage to monitor Jonathan's progress and alert his doctors to any potential problems. Plaintiffs' request is reason-

able and necessary and are adequate yearly cost figures.

These expenses comprise Jonathan's immediate and future care needs up until age 20. Plaintiff has outlined the duration and cost for each requirement. *See Plaintiffs' Exhibit Chart 23A.* This Court turns now to Jonathan's adult care needs.

■ The primary item of care for Jonathan's adult years is the adult living center. Mr. Bussey, Plaintiffs' witness on rehabilitation counseling testified as to the need for and cost of the adult living center.

Mr. Bussey's expertise is in matching the disabled individual's needs with the available services necessary to compensate for the disabilities. Mr. Bussey's opinions were based on his conversations with Mrs. Muenstermann, as well as his examination of the reports by Dr. Owen, Dr. Minsky and other experts hired by the Government to examine Jonathan. His opinion also rests on his experience in performing rehabilitative evaluations for thousands of individuals and he currently specializes in rehabilitative counseling for the severely impaired. In Mr. Bussey's view, Jonathan's deficiencies from his brain damage, such as his impaired speech and hemiparesis, will prevent him from ever living an independent existence. As Mr. Bussey testified, his functional development, achieving the level of an eight to ten year old, coupled with his behavioral and physical impairments, will require that when Jonathan matures, he live in a long-term residential care facility. This adult living facility is a place where an individual can live throughout the year. The adult living facility that Mr. Bussey discussed would have around the clock supervision for Jonathan and the other residents, as well as planned activities. This adult living center will provide for only his most basic needs, *i.e.*, room, board, and people to watch over him. There is no calculation in the Plaintiffs' figure for additional medical expenses. Mr. Bussey's opinion of Jonathan's need for an adult living center is supported by the testimony of Doctors Owen, Minsky and Clancy. In their opinion, Jonathan's permanent injuries prevent his ever living an independent

life. Plaintiffs' cost figures are for the cost of actual facilities in the area where Jonathan lives. This court finds the annual expense for the adult living center to be necessary and reasonable in light of the damage to Jonathan as a result of the stroke.

■ Mr. Bussey testified that Jonathan's deficiencies as a result of the stroke will prevent him from ever obtaining or holding gainful employment in the competitive economy. This conclusion was supported by Dr. Minsky's testimony. Although Jonathan is in some ways only moderately impaired, as discussed above, the boy's uneven abilities will exacerbate his problems, further decreasing his chances for gainful employment. This Court finds by a preponderance of the evidence that Jonathan will not be able to find employment in the competitive economy as a result of the damage he sustained from his stroke.

■ The Government contends that Jonathan will be able at least to obtain sheltered workshop employment. Mr. Bussey testified that these jobs pay a small fraction of minimum wage, typically 42 cents to 44 cents per hour or about $12 a week. Jonathan's disabilities may not prevent him from obtaining one of these jobs. Nevertheless, federal and state government budget reductions are reducing the availability of these positions. Mr. Bussey testified that the demand for these jobs is roughly ten times their supply. As such, this Court finds by a preponderance of the evidence that Jonathan is unlikely to secure one of these positions. Jonathan will not be able, therefore, to use the small income from one of these jobs to offset the loss of his total income as a result of the damage he sustained from the stroke.

■ This Court must now determine what level of education and concomitant employment Jonathan would have attained had he not suffered the stroke. This decision is difficult, requiring an analysis of factors that depend on circumstances that are necessarily beyond any certain assessment. Plaintiffs' presented this court with

three possible scenarios ranging from skilled trade craft to "white collar" employment. Mr. Bussey linked Jonathan's employment opportunities to the level of education the boy would have completed absent the injury. *See Plaintiffs' Exhibit Chart 23B.* The educational levels Mr. Bussey considered appropriate given Jonathan's family background were high school graduate, two to three years of completed college and receipt of bachelor's degree. Mr. Bussey testified that he used surveys published by the United States Department of Labor. These surveys identify wage rates for various jobs in different regions of the country.

Mr. Bussey testified that family background provides a good basis for predicting what might have been Jonathan's employment attainment absent the stroke. Mrs. Muenstermann testified that she graduated at the "top" of her high school. She is currently in college. Mr. Muenstermann accumulated some college credit. Mr. Muenstermann held a job as communications specialist in the United States Air Force, serving as a supervisor in the White House Communication's Center. At the White House, he testified he had responsibility for worldwide communications. He traveled with both the President and Vice President. Jonathan's siblings, Mrs. Muenstermann testified, are both doing well in school. Given these facts, and in consideration of Mr. Bussey's testimony, this Court finds by a preponderance of the evidence that Jonathan would have completed college. Jonathan's lost employment opportunity, as a result of the stroke, is commensurate with someone attaining a bachelor's degree.

Doctors Clancy and Owen testified that Jonathan's life expectancy will not be affected by his disabilities. The cost calculations for Jonathan's future medical expenses as well as his lost wages should be based, therefore, on a normal life expectancy. Dr. Lurito, Plaintiffs' expert economist testified that according to the Department of Health and Human Services, a white male of Jonathan's age of 5 years and eight months can expect to live another 67.1 years. Using U.S. Department of Labor statistics, and matching Jonathan's life expectancy with his expected education attainment, Dr. Lurito testified that Jonathan's expected work life would have been forty years.

As a final element of damages, this Court finds by a preponderance of the evidence that Jonathan will suffer significant pain and suffering because of his stroke. Jonathan's uneven abilities will cripple his development and yet allow him to understand that he lags behind his peers. These injuries are permanent. As the disparity increases between life's demand and Jonathan's abilities, his mental pain and suffering will grow.

### B. Conclusions of Law

Under the FTCA, the United States is liable "in the same manner and to the same extent as a private individual when like circumstances ..." 28 U.S.C. § 2674. In this action Plaintiffs maintain that the injuries sustained by Jonathan were caused by the negligent acts of doctors who, all parties agree, were employed by the United States and acting within the scope of their employment.

#### 1. Statute of Limitations

The government contends that this action is barred by the statute of limitations because the Plaintiffs did not file their claim within two years of Jonathan's injury. Under the FTCA a "tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues ...". 28 U.S.C. section 2401(b) (1978 & 1991 Supp.). A claim accrues under the FTCA when the claimant knows both the cause and the injury. *United States v. Kubrick*, 444 U.S. 111, 120–124, 100 S.Ct. 352, 359–360, 62 L.Ed.2d 259 (1979).

Defendant claims that Plaintiffs knew both the cause and Jonathan's injury when Dr. Rouse informed the Muenstermanns of the miscommunication that resulted in Mr. Muenstermann receiving the wrong blood test. Since the meeting between Dr. Rouse and the Muenstermanns

took place on April 10, 1986 and the Plaintiffs did not file their claim until April 14, 1988, Defendants maintain that the claim was filed four days late.

The government attempts to shield itself from liability for the brain damage by piggy-backing the negligence of the misdiagnosis and mismanagement of Jonathan's birth onto another act of negligence, the miscommunication between Doctors Rouse and Gurdian. While the Defendant does not contend that the Muenstermanns actually knew of Jonathan's brain damage before the December 30, 1986 CT scan, they do claim that the stroke was just another effect of the blood disorder which the Plaintiffs were aware of on April 10, 1986.

Defendant can only be correct if the brain injury was caused by the blood disorder and the stroke is merely another different effect of the anemia Jonathan suffered at birth. As more fully articulated in the Court's findings of fact, neither assertion is justified by the evidence.

This Court found by a preponderance of the evidence, that Jonathan's blood disorder was not likely to have been the cause of, nor was a substantial factor in causing, the brain injury. Similarly, this Court found by a preponderance of evidence, that Jonathan's brain damage is not another effect of the blood disorder. As such, Plaintiffs did not know of either the cause or the brain injury that Jonathan suffered until the December 30, 1986 CT scan. Therefore, since Plaintiffs filed their claim within two years of the CT scan, their claim is not barred by the statute of limitations. *See*, 28 U.S.C. section 2401(b); *Kubrick*, 444 U.S. at 120–24, 100 S.Ct. at 359–60. The Court's decision that the Plaintiffs did not know, nor, could not have known of Jonathan's injury even using the reasonable care they exercised, is consistent with decisions reached by other courts under similar circumstances. *See e.g., Jastremski v. United States*, 737 F.2d 666 (7th Cir.1984) (Court upheld District Court finding that plaintiffs' claim was not barred by statute of limitations even though parents did not discover the brain injury due to negligence of obstetrician until four years

after the birth of the boy); *Nemmers v. U.S.*, 681 F.Supp. 567, 570 (C.D.Ill.1988) (on remand from Circuit Court, District Court found plaintiffs used reasonable care in learning of son's brain injury a full eight years after the negligent acts by the obstetrician).

### 2. Negligence

Since the negligent act giving rise to liability occurred in Maryland, Maryland law governs the substantive law including the measures of damages to be awarded. *See, e.g., United States v. Muniz*, 374 U.S. 150, 153, 83 S.Ct. 1850, 1852, 10 L.Ed.2d 805 (1963); *Richards v. United States*, 369 U.S. 1, 6–10, 82 S.Ct. 585, 589–91, 7 L.Ed.2d 492 (1962); 28 U.S.C. § 1346(b) and § 2674. The prima facie case for establishing medical malpractice consists of: (1) determining the applicable standard of care, (2) demonstrating that this standard has been breached, (3) developing a causal relationship between the violation and the injury. *Weimer v. Hetrick*, 309 Md. 536, 553, 525 A.2d 643 (1987); *Waffen v. U.S. Dept. of Health & Human Services*, 799 F.2d 911, 915 (4th Cir.1986); *see also, Jacques v. First Nat'l Bank*, 307 Md. 527, 515 A.2d 756 (1986) (Maryland recognizes a tort duty of care arising out of dealings with professionals, such as physicians).

### (a) *Standard of Care*

In Maryland, physicians owe a duty to use the care expected of a reasonably competent practitioner of the same class and acting in the same or similar circumstances. *Figueiredo–Torres v. Nickel*, 321 Md. 642, 650, 584 A.2d 69 (1991); *Shilkret v. Annapolis Emergency Hospital Assoc.*, 276 Md. 187, 349 A.2d 245 (1975). A physician's treatment is evaluated against a national, not local, standard of care. *See Shilkret*, 276 Md. at 190–195, 349 A.2d 245 ("Whatever may have justified the strict locality rule fifty or a hundred years ago, it cannot be reconciled with the realities of medical practice today.").

In the instant case, the standard of care is clear. Both Plaintiffs and Defendants agree that attempting a vaginal birth in the

face of a placenta previa is a breach of the standard of care. As Dr. Gurdian testified, a timely caesarian section is the required procedure if the mother has a placenta previa. Plaintiffs expert witnesses put the point more precisely. A caesarean section, Dr. Palmer testified to a reasonable degree of medical certainty, must be performed at the 36th to 38th week of the pregnancy. We need not rehash the reasons for this conclusion. Jonathan's delivery was not accomplished through a timely caesarean section. Rather, Jonathan was delivered through a crash or emergency caesarean section after the distress he was under became clear to even Dr. Gurdian. His delivery occurred after Dr. Gurdian's attempts to induce a vaginal delivery.

#### (b) *Breach*

In determining whether Dr. Gurdian breached the standard of care by not performing a timely caesarean section, the only issue is whether she should have made the diagnosis that Mrs. Muenstermann had a placenta previa. Reasonable foreseeability is an essential ingredient of actionable negligence. *See, Eastern Shore Pub. Serv. Co. v. Corbett,* 227 Md. 411, 177 A.2d 701 (1962).

Plaintiffs have met the burden of demonstrating that Dr. Gurdian should have made the diagnosis. As discussed in the findings of fact, the multiple sonograms, the fact that at delivery, the fetus' head was not engaged in the cervix, and Jonathan's irregular heart beat all indicated the presence of a placenta previa. This Court finds by a preponderance of the evidence that Dr. Gurdian breached the standard of care in not diagnosing Mrs. Muenstermann's placenta previa.

Therefore, this Court finds by a preponderance of the evidence that Dr. Gurdian's efforts to induce a vaginal delivery instead of performing a timely caesarean section at 36 to 38 weeks of the pregnancy, also breached the standard of care.

#### (c) *Causation*

Having determined that Mrs. Muenstermann's doctors breached the standard of care, this Court examines whether that breach is the legal proximate cause of Jonathan's injuries.

In a medical negligence action, plaintiff bears the burden of proving by a preponderance of the evidence that the defendants' breach proximately caused the injury. *Robin Exp. Transfer, Inc. v. Canton R.R. Co.,* 26 Md.App. 321, 334, 338 A.2d 335 (1975). In demonstrating proximate causation, "... the plaintiff must prove the defendant's breach of duty was more likely then not (*i.e.,* probably) the cause of injury." *Hurley v. U.S.,* 923 F.2d 1091, 1094 (4th Cir.1991). Plaintiffs met that burden.

Testimony at trial overwhelmingly established that the primary danger of inducing a vaginal delivery was the risk of the separation of the placenta from the wall of the uterus. The evidence is undisputed that Jonathan's placenta separated at birth. The evidence is undisputed that Jonathan was healthy prior to Dr. Gurdian's efforts to induce labor. The evidence is undisputed that the severe stress Jonathan suffered began with Dr. Gurdian's efforts to induce labor. Because this Court found by a preponderance of the evidence that the separation of Jonathan's placenta from the wall of the uterus at birth was the result of Dr. Gurdian's actions to induce labor, this Court finds that the stroke was more likely than not caused by Dr. Gurdian's breach of duty.

Dr. Gurdian's efforts to induce labor were a substantial factor, and the proximate cause of the stroke Jonathan suffered at birth. It was this stroke at birth which this Court finds, by a preponderance of the evidence, that more likely than not caused the severe brain damage the boy suffered. As more fully articulated in the findings of fact, as the placenta separated from the uterine wall, Jonathan's brain was deprived of oxygen and blood. If Dr. Gurdian had performed a timely caesarean section, the stroke would not have occurred, nor would Jonathan be brain damaged.

The Government's argument on Motion for Judgment that the Plaintiffs failed to establish proximate cause are rejected. Because Dr. Gurdian's negligent acts more

likely than not caused the injury, Plaintiffs have met their burden. *See Robin Express* 26 Md.App. at 334, 355, 338 A.2d 335; *Hurley*, 923 F.2d at 1094.

#### (d) *Damages*

##### (1) Future Medical Care Needs

 Plaintiffs' damages for future medical care costs are recoverable under Maryland law. *Mt. Royal Cab Co., Inc. v. Dolan*, 166 Md. 581, 171 A. 854 (1934). An item of future expense is recoverable if it ·is more likely than not that the expense will be incurred. *Burke v.ᶜ United States*, 605 F.Supp. 981, 988 (D.Md.1985); *Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 464 A.2d 1020 (1983); *Davidson v. Miller*, 276 Md. 54, 61–62, 344 A.2d 422 (1975). Relying on the findings of fact made, this Court holds that the medical expenses produced by the Plaintiffs are fair, reasonable and likely to be incurred. *See Plaintiffs' Exhibit Chart 23A* (itemizing the cost of Plaintiffs' future care needs).[4]

 Plaintiffs, $11,700 yearly request for special educational tutoring is reasonable and necessary for Jonathan. Although the Defendant maintains that such tutoring is by law provided by the state. Plaintiffs' figure is, however, based on what Jonathan needs are above and beyond what the state or federal government provides. Further, the government did not present any evidence of the value of services available to Jonathan through the public schools and therefore no set off for these benefits is even possible to calculate. *Scott v. United States*, 884 F.2d 1280, 1284 (9th Cir.1989).

Plaintiffs established that Jonathan's uneven abilities will make learning in a group setting difficult. As Defendant repeatedly emphasized, Jonathan's I.Q. range is below average to mildly retarded. However, he has severe behavioral problems. Further, Jonathan can apparently understand much more · than he is capable of conveying. These disparate abilities exacerbate his learning problems because they increase his frustration. All of these factors require that the boy get special tutoring attention through age twenty, as Plaintiffs request.

 Defendant disputes the need and cost for Plaintiffs' request for attendant care. Defendant points out that Mrs. Muenstermann is caring for him now and that when day care was required, Jonathan's day care cost was $4 per hour, not Plaintiffs' request of $12.10 per hour. This Court notes that Jonathan needs constant supervision. Although his mother is caring for him now, she is currently attending college and needs someone to watch over him while she is gone. Further, Jonathan's needs for constant attention will have a severe impact on the rest of the family if Mrs. Muenstermann is not able to find relief and give her other two children the care and nurturing they deserve.

This Court finds Defendant's argument that attendant care is not recoverable because the mother is already providing it unpersuasive. Maryland recognizes the right to recover for the value of material services rendered to an injured child. *Les-*

---

4. This Court finds Plaintiffs' requests reasonable and necessary in order to meet Jonathan's future care needs. As a matter of law, this Court concludes these items are necessary with one adjustment for Jonathan's adult-living center. While not authoritative, it is instructive to note that most of the items Plaintiffs request have been listed as part of damage requests in other FTCA cases, where a plaintiff's needs required the item. *See e.g., Nemmers v. United States*, 612 F.Supp. 928, 935 (C.D.Ill.1985) (court included cost of two full-time live-in health care providers for boy who sustained severe brain damage at birth) (vacated and remanded on other grounds, *Nemmers v. United States*, 795 F.2d 628 (7th Cir.1986)); *Foskey v. United States*, 490 F.Supp. 1047, 1065 (D.R.I.1980) (court

awarded future costs of special equipment to meet plaintiff's needs); *Wright v. United States*, 507 F.Supp. 147, 162 (E.D.La.1981) (court awarded costs of medical tests and supplies); *Johnson v. United States*, 704 F.2d 1431, 1442 (9th Cir.1983) (court awarded round the clock nursing care); *Powers v. United States*, 589 F.Supp. 1084, 1103–04 (D.Conn.1984) (court awarded professional therapeutic services); *Reilly v. U.S.*, 665 F.Supp. 976, 983–1009 (D.R.I. 1987) (court approved an award for a variety of items, including full time nursing, therapy, special equipment, medical services, special tutoring) decision reversed in part and remanded in part on other grounds, *Reilly v. United States*, 863 F.2d 149 (1st Cir.1988).

ter v. Dunn, 475 F.2d 983 (D.C.Cir.1973). Mrs. Muenstermann's care of Jonathan is certainly greater than what it would have been absent the stroke, and Jonathan's needs will increase. The additional care provided should be compensated.

As to the hourly rate, this Court notes that the Plaintiff is not required to choose the cheapest care and treatment, but may select from among a number of reasonable alternatives. *See Ramrattan v. Burger King Corp.,* 656 F.Supp. 522, 525 (D.Md.1987) (Plaintiff must mitigate damages but is not required to mitigate the expense of necessary care). The low current rate that Mrs. Muenstermann received was based in part on Mrs. Moore's friendship with Mrs. Muenstermann. This Court notes that even gratuitously furnished medical care and treatment are recoverable. *See Plank v. Summers,* 203 Md. 552, 562, 102 A.2d 262 (1954) ("... where hospital and medical care are furnished gratuitously to the injured party, he can recover the value of those services from the tort feasor"). Plaintiffs have not asked to recover damages for child care services already provided, but this Court notes that the previously low rates paid by Mrs. Muenstermann should not foreclose the recovery of future, higher hourly rates. *See Id.* Finally, and most importantly, Jonathan needs constant supervision because he poses a danger to himself and other children. Given Jonathan's behavioral problem, it would be speculative to rely on the boy's current day care situation as a lasting one. Plaintiffs' request for attendant care through age twenty is reasonable and necessary. *Cf. Ramrattan,* 656 F.Supp. at 524 (District Court approves full time attendant care based on the reasonable probability that the Plaintiff will need this care).

Jonathan's need for therapy is not seriously challenged, given his range of disabilities from which he suffers as a result of the stroke. The testimony strongly indicates that Jonathan would benefit from the therapy that Plaintiffs request. Therefore, this Court approves Plaintiffs' request for physical, occupational, speech/language, and individual psychotherapy for Jonathan through age twenty. As a matter of law, this Court finds these expenses, which are also supported in the findings of fact, necessary and recoverable. *Pierce,* 296 Md. at 656, 464 A.2d 1020.

To ensure that Jonathan's treatment is proceeding properly and any physical, emotional or developmental difficulties are diagnosed early, Plaintiff recommends certain yearly evaluations. Certain medical services, psychiatric, neuropsychological evaluations are needed through age twenty. These expenses appear to be reasonable and necessary in light of his circumstances, as are certain other related expenditures. The educational/developmental yearly evaluations are recommended through age fifteen, while the physical and occupational and speech evaluations are recommended yearly through age twelve. The evidence strongly supports the need for these continued evaluations of Jonathan. *Id.*

Finally, Jonathan's development will improve with the assistance of certain equipment. Plaintiffs request a two time purchase of adaptive communications devices, as well as a computer/printer and educational software to help Jonathan learn. This Court in its findings of fact found these expenses reasonable and necessary and now finds proper support for these expenses as a matter of law. *See, Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 464 A.2d 1020 (1983).

The irreparable brain damage Jonathan sustained as a result of the stroke requires that he receive attention and supervision throughout his life. This Court found that, Jonathan requires a long term care facility to attend to his adult living needs. This Court makes one modification to Plaintiffs' cost estimate for Jonathan's adult living center expenses.

Under the FTCA generally, state law controls the type and amount of compensatory damages a plaintiff may recover. *See Muniz,* 374 U.S. at 153, 83 S.Ct. at 1852. The FTCA also forbids the recovery of punitive damages. Where the recovery for

one type of compensatory damages would lead to double recovery, the Fourth Circuit has held that such recovery is punitive and reduced the damage award even where state law defines recovery as compensatory. *See Flannery for Flannery v. United States*, 718 F.2d 108, 112–13 (4th Cir.1983) (recovery for lost earnings reduced because it duplicated the award for future medical expenses).

■ Plaintiffs cost calculation for the adult living center includes expenses for room and board. Inasmuch as these expenses are normally paid out of one's income, the Courts' award for lost income would amount to double recovery. The Court reduces by half the yearly cost of the adult living center. This reduction is based on Plaintiffs' own estimate of the proportion of the adult living center expenses that would fund Jonathan's room and board.

With the exception of this adjustment, this Court adopts as a matter of law, the list and annual cost estimates that this Court found, by a preponderance of the evidence, Plaintiffs would incur for Jonathan's future care needs. *See Davidson*, 276 Md. at 61–62, 344 A.2d 422.

■ This Court turns its attention to calculating the total cost of Jonathan's future care needs. As noted in the findings of fact, Jonathan's life expectancy is not affected by his brain injury. Dr. Lurito testified that, based on Dr. Minsky's and Mr. Bussey's reports and his examination of U.S. Department of Health and Human Services statistics, Jonathan can expect to live another 67.1 years.

In order to arrive at the present value of Jonathan's future care needs, Dr. Lurito examined the Consumer Price Index for medical expenses and found that they have escalated in excess of seven and a half percent over the past 25–30 years. Further, Dr. Lurito found that using a portfolio of investments that includes government, municipal and high grade corporate bonds, certificates of deposit and treasury bills, he could invest that money at about eight to eight and one half percent. Dr. Lurito noted that interest rates are quite low now, so his eight percent investment figure is based upon an examination of some historical investment rates.

Using these figures, Dr. Lurito arrived at an after tax discount rate of six percent. To finish his calculation, Dr. Lurito escalated each of the yearly costs for the number of years of need indicated by the reports prepared by Dr. Minsky and Mr. Bussey. The figures were then discounted to their present value using a six percent discount rate. In the case of Jonathan's expenses for the adult living center costs, Dr. Lurito used Jonathan's life expectancy estimate of 73 years beginning at age twenty-one, when Jonathan will begin living there.

This Court finds that Dr. Lurito's method is acceptable. *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 547–48, 103 S.Ct. 2541, 2556, 76 L.Ed.2d 768 (1983). However, based on the testimony of Defendant's expert economist, Dr. Scarborough, this Court reduces Dr. Lurito's medical cost escalation figure from seven to six percent. *Cf., Jones & Laughlin*, 462 U.S. at 553, 103 S.Ct. at 2558 (Supreme Court directed District Court to "make a deliberate choice" in its method of discounting).

Dr. Scarbrough cited two compelling reasons to reduce the medical escalation figure in his opinion. First, the long term rate of inflation is about four and one half percent. Dr. Scarbrough's projection is based on Social Security Administration studies. Further, long-term treasury bond rates are at roughly 7.85%, and since investors, in his opinion, typically want a three to three and one half percent rate of return after inflation that would also indicate that inflation is approximately four and one half percent. Second, although Dr. Scarbrough noted that the cost of medical services and equipment are rising faster than other goods and services, as a matter of logic, these expenses cannot continue this rate of increase. In his opinion, if this rate of increase continues indefinitely, virtually all of the Gross National Product would be bound up in health care services and goods. As such, the escalation of health care costs must decline. This statement is supported somewhat by Dr. Lurito who himself chose a seven percent cost escalation figure that

was a little below the seven and one half percent escalation rate revealed by his historical data. However, Defendants' escalation rate of five percent is too low, Dr. Lurito and Dr. Scarbrough both testified that medical expenses are rising faster than other economic costs. Therefore, based on the testimony of both Plaintiffs' and Defendant's expert economists, this Court chooses a six percent escalation rate. *Id.*

The Court had Dr. Lurito recalculate Jonathan's future medical expenses at the reduced escalation rate, accounting for the reduction of room and board in the adult living center. These figures are represented on the Court's attached chart which shows the present value of Jonathan's total future care costs to be $2,498,000. See *Chart Court Estimate of Future Care Costs.*

### (2) Loss of Income

■■■■ This Court now turns its attention to Jonathan's loss of income as a result of the brain damage he sustained. In Maryland a plaintiff may recover damages for loss of earning capacity that may reasonably be expected in the future. *Adams v. Benson*, 208 Md. 261, 117 A.2d 881 (1955). This calculation for lost income includes fringe benefits. *Great Coastal Express Inc. v. Schruefer*, 34 Md.App. 706, 369 A.2d 118 (1977) remanded on other grounds, appeal after remand. *Great Coastal Express, Inc. v. Schruefer*, 39 Md. App. 88, 383 A.2d 74 (1978). As with the calculation of future medical care, an item is recoverable if it more likely than not would have occurred. *Burke*, 605 F.Supp. at 988; *Pierce*, 296 Md. at 656, 464 A.2d 1020.

First, this Court found that Jonathan's life expectancy is normal, 67.1 more years. Second, Dr. Lurito calculated that based on

U.S. Department of Labor statistics, Jonathan would have had a working life of forty years. This figure assumes that he would have entered the work force after college at age twenty-two and retired as the statistics indicate, at age 62.

Third, this Court found, in its findings of fact, that based on Jonathan's family background, he would have secured a bachelors of arts degree and obtained a job commensurate with that educational level. Fourth, Dr. Lurito used the average income for a college graduate. Fifth, Dr. Lurito adjusted Jonathan's income for increases due to the rate of inflation and productivity growth. According to Dr. Lurito, historically inflation has increased by about five and one half percent, while productivity has increased wages by 1.43%. Dr. Lurito rounded down his escalation figure to seven percent.

Sixth, Dr. Lurito used the same six percent discount rate to calculate the present value of Jonathan's income loss.[5] *Baublitz v. Henz*, 73 Md.App. 538, 547–50, 535 A.2d 497 (1988) ("In Maryland, the law presently is that in a personal injury action, ... any damages awarded for loss of future earning capacity must be reduced to present value.") (citing *Burke v. United States*, 605 F.Supp. 981, 990 (D.Md.1985)).

After arriving at a present value calculation, Dr. Lurito deducted federal income taxes from the income Jonathan would have received. Dr. Lurito deducted between 18% and 19% of Jonathan's earnings based on current federal tax law. *See Burke*, 605 F.Supp. at 991 (citing *Flannery* 718 F.2d at 111–12). Dr. Lurito did not deduct any income for state income taxes that Jonathan would have to pay. *Id.* at 991.[6]

---

**5.** As this Court has already found that Jonathan will not be able to secure competitive employment because his disabilities as a result of the stroke, no offset for income earned is needed. For similar reasons, this Court declines to reduce Jonathan's income by the wages he might earn in a sheltered workshop. Although Jonathan may be able to do this type of employment, it is pure speculation to assume that he will be

able to secure one of the jobs, as demand for these jobs far exceeds their supply.

**6.** As the *Burke* court stated, "[t]he reasoning behind the federal income tax exception is not applicable to State taxes. State taxes are strictly between the plaintiff and the State. They are of no legitimate concern to the United States Government as a defendant." *Id.*

■ The figure Dr. Lurito arrived at for the present value of total income lost due to Jonathan's injuries minus the deduction for federal taxes as $2,313,512. While this Court has no quarrel with Dr. Lurito's method, the Court asked Dr. Lurito to reduce his escalation calculation from seven to six percent.

Again this Court is in agreement with Defendant's economist Dr. Scarbrough who stated that his inflation rate calculation was four and one half percent. When this inflation rate is added to the productivity growth rate that both economists agree is about one and one half percent, the six percent escalation factor is a more reasonable figure in light of the testimony. Recalculating the lost wages using the Court's escalation factor, Dr. Lurito found it yielded a present value for Jonathan's loss of income of $1,860,000.

### (3) Annuity

■ Defendant argues that the Court should base its damage calculation on a structured settlement. A structured award involves the purchase of an annuity and a schedule of payments that would provide an inflation-adjusted income stream equal to the total damages incurred over the course of Jonathan's life. It is unclear whether the government was urging the Court to make a lump-sum payment based on their cost calculations on the purchase of an annuity or whether government asking the Court to force an annuity on the Plaintiffs. The Court can not accept either alternative.

The attractiveness of the government's offer rests primarily on the difference in the cost calculation for meeting Jonathan's needs. Dr. Scarbrough calculated that an annuity to meet Jonathan's long term medical needs could be purchased for $1,036,272, while the cost of an annuity to cover Jonathan's lost earnings would be $1,264,-

003. This appears to be substantially less than the $4,358,512 that this Court found necessary to compensate Jonathan's economic damages.

Lurking in the shadows behind Defendant's argument is the FTCA's prohibition against punitive damages and the *Flannery* opinion that does not bind federal courts to state law damage definitions. If the Defendant is correct, that Jonathan's compensation could be secured for less through the use of an annuity then the excess could be viewed as punitive damages. *See Flannery*, 718 F.2d at 111–112; *see also, Reilly*, 665 F.Supp. at 1016 (government presented this argument to the Rhode Island District Court which rejected it); *Reilly*, 863 F.2d 149, 168–170 (1st Cir.1988) (citing other cases and Circuits that rejected this argument).[7]

Beyond the alleged difference in cost between the annuity and using more traditional methods to calculate a lump sum payment, an annuity has other features that recommend it. An annuity relieves both the court and the plaintiff of certain risks. An annuity eliminates the need for court analysis of various economic indicators that affect the total value of the award. Instead, companies in the private market with expertise in this area would do what courts do now. In the same vein, the risk of miscalculation would be shouldered by these companies instead of by plaintiffs. If a plaintiff invests poorly, or if a plaintiff lives beyond the life expectancy covered in the award, then a party will have been undercompensated. An annuity, on the other hand, makes the periodic payments no matter how long the plaintiff lives.

In the instant case the difference between the cost of an annuity versus a lump sum payment calculated by traditional means may be more of a mirage. First, Defendant did not use all of Plaintiffs' cost

---

7. In rejecting this argument the First Circuit criticized the government's reading of *Jones & Laughlin* where the Supreme Court stated in part that an award for damages could in theory take the form of periodic payments. "Many things are possible 'in theory'—e.g., moving faster than a speeding bullet, leaping tall buildings at a single bound—but to transform theoretical

possibility into actuality, without the faintest shred of precedential support, is a feat more suited to disciples of Blackstone on Magic than to students of Blackstone's Commentaries. The carefully landscaped terrain of the FTCA allows for no such necromancy to be practiced." *Reilly*, 863 F.2d at 169.

figures. For example, Dr. Scarbrough was instructed to price annuities assuming Plaintiffs could find attendant care for $6 per hour instead of Plaintiffs' estimate of $12.10 per hour. As discussed in the findings of fact, there is no evidence to support this cost figure. Also Defendant also did not use Plaintiffs' cost figure for special education tutoring, but used instead a lower figure. Second, there is an unresolved dispute over whether Defendant properly calculated the tax consequences of the annuity. Dr. Lurito testified that after tax consequences of Dr. Scarbrough's annuity calculation would not cover Jonathan's lost income or his future care needs, even as Defendant assesses these damages.

Beyond the difficulty in assessing the real cost savings, the Court questions the wisdom of requiring the Plaintiffs to put all of their eggs in one basket. Jonathan's needs are expected to extend to the year 2065. Relying on one company, the insurance company that underwrites the annuity, to last that long may actually place more risk on the Plaintiffs than having them diversify their investment portfolio among a range of public and private bonds and securities and certificates of deposits.

█ This Court rejects the argument that lump sum damage awards calculated by traditional means are punitive. If the damage awards are computated correctly, they will be just enough to last for Jonathan's life—no more and no less. The computation of this award was based on the evidence that reflects Jonathan's future care needs and compensation for lost income.

The government's authority did little to establish their position. *See Scott* 884 F.2d at 1287–88 (Circuit court required District court to consider annuity evidence); *Ramrattan,* 656 F.Supp. at 523–24 (evidence of the cost of an annuity was admissible). These cases do not direct a court to accept an annuity. Instead, these cases stand for the proposition that a court should listen and consider an annuity, which this court did.

What little authority there is runs counter to Defendant's position. In the absence of a structured settlement agreement between the parties, the Court has no alternative but to order the payment of a lump sum. *See Jones & Laughlin,* 462 U.S. at 533, 103 S.Ct. at 2548–49 ("The award could in theory take the form of periodic payments, but in this Country, it is traditionally taken the form of a lump sum, paid at the conclusion of litigation."); *see also, Reilly,* 863 F.2d at 168–70; *Frankel v. Heym,* 466 F.2d 1226, 1228–29 (3rd Cir. 1972).

### (4) Nonpecuniary Damages

The full extent of nonpecuniary damages is difficult to measure. The amorphous nature of the subject and the infinite variables that come into play make it impossible for courts to fashion any precise rule. However, the strictures of reasonableness, and the nature of the injuries, length of the suffering are guides which assist in determining a fair award.

█ These standards are a part of Maryland law. Jonathan's physical pain and suffering may be considered as an element of damages. *Greenstein v. Meister,* 279 Md. 275, 368 A.2d 451 (1977). Similarly, Jonathan's mental and emotional suffering and anxiety as a result of the injuries and their future consequences can also be considered. *White v. Parks,* 154 Md. 195, 140 A. 70 (1928); *Buck v. Brady,* 110 Md. 568, 73 A. 277 (1909). The loss of Jonathan's capacity to enjoy the usual and familiar tasks of life is compensable in Maryland. *McAlister v. Carl,* 233 Md. 446, 197 A.2d 140 (1964). Finally, the permanency of Jonathan's injuries is an acceptable basis for awarding nonpecuniary damages. *Katz v. Holsinger,* 264 Md. 307, 319, 286 A.2d 115 (1972).

█ Taking these factors into consideration this Court awards Jonathan $800,000 for the nonpecuniary loss he has and will continue to suffer. Jonathan's brain is permanently and severely damaged. This damage robs him of the ability to ever know the joys of doing even the most usual and familiar tasks. He has severe difficulties in attempting even the simplest communication with others. This deficiency

will leave him somewhat more lonely and isolated from the world around him.

Jonathan will never live independently. He requires help to dress and go to the bathroom. He lags far behind his peers and he knows it. As he grows the effects of his disabilities will be magnified when compared against the tasks others take for granted and that he will never be able to do.

■ In making this award this Court is aware that the nonpecuniary damages awarded exceeds the limit imposed on non-economic damages of $350,000. Md.Cts. & Jud.Proc.Code Ann. § 11–108(b). It is the position of this Court that this cap has no application to this case.

On its face, the statute is clear in applying only to actions that occur after July 1, 1986. The negligent acts in this case occurred in March of 1986. Further, Maryland courts have clearly stated that the damage cap has no retroactive application, not even as a guide for limiting damages. *United States v. Searle*, 322 Md. 1, 6, 584 A.2d 1263 (1991).

■ This interpretation is consistent with this Court's finding that the statute of limitations did not begin to run until December 30, 1986, nearly six months after the effective date of the cap. Under Maryland law an action arises for purposes of the cap when facts exist to support each element of the cause of action. *Owens–Illinois v. Armstrong*, 87 Md.App. 699, 591 A.2d 544 (1991). In this case, the action arose in March of 1986 when the misdiagnosis and mismanagement of Jonathan's labor occurred. However, for purposes of the statute of limitations an action accrues under the FTCA when the cause and the injury are known. *Id.; United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). As such, the negligence arose in March, and the action accrued for the statute of limitations purposes in December of 1986.

## III. CONCLUSION AND ORDER

This Court finds that the Defendant, the United States of America, in acting by and through its attending obstetrician, negligently administered obstetric care during the birth of Jonathan Muenstermann, which proximately caused damage to Jonathan's brain. This Court finds that Plaintiffs are entitled to the damages as contained in herein. The total damage award is $5,158,512.

FUTURE CARE COSTS
OF
JONATHAN E. MUENSTERMANN
(Plaintiffs' Exhibit Chart 23A)

| Aspect of Need | Duration of Need | Current Annual Cost | Present Value Cost |
|---|---|---|---|
| Special education tutoring | yearly through 20 | $ 11,700 | $ 213,692 |
| Attendant care | yearly through 20 | 53,240 | 972,388 |
| Adult living center | yearly age 21 for life | 47,650 | 3,715,595 |
| Physical therapy | yearly through 20 | 5,720 | 104,471 |
| Occupational therapy | yearly through 20 | 5,720 | 104,471 |
| Speech/language therapy | yearly through 20 | 5,720 | 104,471 |
| Individual psychotherapy | yearly through 20 | 5,720 | 108,566 |
| Adaptive communications devices | onceover at age 4.07 | 2,295 | 2,295 |
| Adaptive communications devices | onceover at age 9.07 | 2,295 | 1,988 |
| Computer/printer | every 5 years age 7 through 20 | 2,000 | 4,941 |
| Educational software | yearly age 7 through 20 | 500 | 7,654 |
| Medical services | yearly age 6.07 through 20 | 706 | 13,400 |
| Physiatrist evaluation | onceover | 230 | 230 |
| Neuropsychological evaluations | yearly through 20 | 1,000 | 18,980 |

| Aspect of Need | Duration of Need | Current Annual Cost | Present Value Cost |
|---|---|---|---|
| Educational/developmental evals | yearly through 15 | · 500 | 6,283 |
| PT/OT/speech evaluations | yearly through 12 | 900 | 8,345 |
| Total | | | $ 5,387,770 |

## PECUNIARY LOSS
## OF
## JONATHAN E. MUENSTERMANN
### (Plaintiffs' Exhibit Chart 23B)

| | Aspect of Loss | Pecuniary Loss | | |
|---|---|---|---|---|
| 1. | Lost Net Income | $1,543,303 – | $1,927,463 – | $2,313,512 |
| 2. | Future Care Costs | 5,387,770 – | 5,387,770 – | 5,387,770 |
| 3. | Total | $6,931,073 – | $7,315,233 – | $7,701,282 |

## COURT ESTIMATE OF FUTURE CARE COSTS
## OF
## JONATHAN E. MUENSTERMANN

| Aspect of Need | Duration of Need | Current Annual Cost |
|---|---|---|
| Special education tutoring | yearly through 20 | $ 11,700 |
| Attendant care | yearly through 20 | 53,240 |
| Adult living center | yearly age 21 for life | 24,000 |
| Physical therapy | yearly through 20 | 5,720 |
| Occupational therapy | yearly through 20 | 5,720 |
| Speech/language therapy | yearly through 20 | 5,720 |
| Individual psychotherapy | yearly through 20 | 5,720 |
| Adaptive communications devices | onceover at age 4.07 | 2,295 |
| Adaptive communication devices | onceover at age 9.07 | 2,295 |
| Computer/printer | every 5 years age 7 through 20 | 2,000 |
| Educational software | yearly age 7 through 20 | 500 |
| Medical services | yearly age 6.07 through 20 | 706 |
| Physiatrist evaluation | onceover | 230 |
| Neuropsychological evaluations | yearly through 20 | 1,000 |
| Educational/developmental evals | yearly through 15 | 500 |
| PT/OT/speech evaluations | yearly through 12 | 900 |
| Court Estimate of the Total Present Value of Future Care Costs | | $ 2,498,000 |
| Court Estimate of the Present Value of Jonathan's Income Loss | | 1,860,000 |
| Court Estimate of the Total Pecuniary Loss · | | $ 4,358,512 |